**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Reymundo GARZA, Defendant–Appellant.**

No. 93–1006.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 24, 1993.

Decided Dec. 6, 1993.

---

Amy B. Hartmann, Office of U.S. Atty., Detroit, MI (argued and briefed), for U.S.

Joseph P. Zanglin, Detroit, MI (argued and briefed), for Reymundo Garza.

Before: KENNEDY and RYAN, Circuit Judges; and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

Appellant Reymundo Garza ("Reymundo") pled guilty to conspiracy to possess with intent to distribute and to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846. As allowed by his plea agreement, he appeals the denial below, following an evidentiary hearing, of his motion to suppress evidence taken during a warrantless stop and subsequent search of his vehicle. Because we find that the search was based upon probable cause developed during the course of a legitimate investigatory stop, we AFFIRM the district court's decision.

## I.

Reymundo was arrested in the early morning hours of February 11, 1992, when federal agents found approximately 150 pounds of marijuana stored in the cab of a semi-truck that he was driving. Agents also stopped a pickup truck traveling a short distance behind the semi-truck. The stops culminated a week-long, round-the-clock surveillance by Drug Enforcement Administration ("DEA") and United States Border Patrol agents in Detroit.

On February 5, 1992, after observing a pickup truck with a Texas license plate and tracing its registration to Tomas Garza ("Tomas"), Detroit DEA agents learned via a computerized intelligence check that Tomas was associated with Mary Jane Ornelas–Garcia ("Garcia") in marijuana and cocaine trafficking. Texas DEA agents informed the Detroit agents that Tomas and Garcia were under indictment in Texas for drug trafficking and weapons charges and that Tomas was awaiting sentencing. The surveillance of Tomas and Garcia began later that day at the Royal Inn ("the Royal") in Dearborn, Michigan, where the two occupied room 159.

On February 6, federal agents learned that there had been telephone contact between room 159 and the Star Motel ("the Star") in Detroit, located about a mile from the Royal on Michigan Avenue. The agents then discovered a semi-truck cab parked at the Star, registered to the same Mission, Texas address as that given by Garcia at the Royal. The cab was in Reymundo's possession. The desk clerk revealed that Reymundo had paid for his room at the Star with cash from a brown paper bag. A Texas DEA agent reported that Reymundo had been present during the execution of a search warrant in Texas, during which cocaine, marijuana and weapons were seized. Surveillance then commenced on Reymundo and his companion Freddy Cruz ("Cruz") at the Star.

In the early morning hours of February 6, prior to the discovery of the semi-truck, a drug-sniffing dog alerted positive for marijuana in the pickup truck that Tomas and Garcia were driving. Later that day, Texas DEA agents relayed to the Detroit agents an informant's tip that Tomas and Garcia were in Michigan to pick up $18 million from previous narcotics sales. They advised that Tomas was very likely armed.

On February 7, an unidentified man entered a room near Reymundo's at the Star. Reymundo then retrieved a bundle from the semi-truck, hiding it with a magazine as he emerged into the open. Soon thereafter, the same unidentified person was seen leaving the Star with a brown paper bag, ostensibly the same bundle that Reymundo had retrieved from the truck.

During the period prior to the eventual departure of the four suspects from the Detroit area, Tomas made several trips to the Star, apparently to check on the semi-truck. On February 10, he and Reymundo went to a restaurant and auto parts store together and then proceeded to "jump start" the semi-truck. While Reymundo and Tomas were gone, Cruz made two trips to check on the semi-truck and then returned to his room. Several calls were placed between room 159

at the Royal and the Star during the week of surveillance.

On the evening of February 10, 1992, the last phone call was placed from room 159 to the Star. Shortly thereafter, Reymundo and Cruz departed in the semi-truck and Tomas and Garcia did likewise in the pickup truck, both vehicles heading west on I–94. Both pulled off the highway at a truck stop west of Ann Arbor. The four individuals acknowledged each other inside the truck stop's market. Reymundo and Tomas spoke briefly in the aisle of the market and then retreated together to a back area, near the telephones. After spending approximately 90 minutes at the truck stop, the two pairs of travelers proceeded west on I–94.

The agents continued following the two trucks and shortly thereafter pulled them off the highway, about a mile apart. Because the agents were in unmarked cars and were concerned about weapons and about the dark and snowy conditions, they had attempted to contact a marked Michigan State Police car, which would obviously be a law enforcement vehicle, for assistance, but were unsuccessful. Between five and ten unmarked cars from the DEA, the Border Patrol and city police departments participated in the stop, each carrying one or two officers. The stop was based on the suspicion of the federal officers that Reymundo and the others were involved in criminal drug activities; moreover, the federal officers believed that Reymundo and the others were armed and dangerous.

Concern for their own safety was intensified by the height of the semi-truck, which made it impossible for the agents to see into the cab from the ground. DEA Agent Perman and another officer approached the semi-truck from behind with weapons drawn. They called for the driver, who was Reymundo, to exit the truck with his hands up, patted him down for weapons, handcuffed him, and turned him over to other agents. Then Perman, not knowing "how many other people were inside the truck ... ordered anyone else ... to come out." Cruz then came out and stated there was no one in the truck. Perman, however, did not "take his word for it" and decided to take a look for himself. Perman testified:

The door, the side door ... approached from the passenger side ... was flapping open ... a quarter of the way or so, so I could see the floorboard ... like the middle of the seat. I didn't see anybody sitting right at the passenger's seat. I couldn't see the driver's seat ... and I couldn't see the rear sleeper part ... at which time I shined my flashlight inside the vehicle and also propped myself up onto the vehicle by using the step, the handrail [on the outside] and the door....

At that point Perman "noticed a strong odor of what I thought to be marijuana.... I propped myself up further and ... looked at the driver's compartment and also in the rear sleeper compartment and shined my light to make sure there was no one else inside. I didn't see anybody else, so I jumped back down to the ground."

In the meantime, Reymundo had been escorted back to DEA Agent Greenlee, who was the supervising agent, placed in his car and his handcuffs removed. Reymundo then gave his oral consent to search the semi-truck. Shortly thereafter, Greenlee was advised by Perman that he had detected the marijuana in the semi-truck, and Greenlee decided to request a written consent to search, which Reymundo executed.

The magistrate judge determined and the district judge accepted that under the proof presented, the law enforcement officers had a reasonable suspicion that those in the semi-truck were involved in criminal drug activity and that they were armed and dangerous. The magistrate judge further concluded that the law enforcement officers were thus justified in making a *Terry* stop of the semi-truck and that Agent Perman thereafter acted within the bounds of the *Terry* doctrine in obtaining probable cause to believe that there was marijuana in the semi-truck, which justified the search of the motor vehicle without a warrant.

## II.

Reymundo argues that the agents lacked both probable cause and "reasonable suspicion" to make the initial stop of his vehicle. He also argues that his forced detention after

being seized was tantamount to an arrest without probable cause, thus tainting any consent to search that he gave while under arrest.[1]

▮ When reviewing the denial of a motion to suppress evidence, we must consider the evidence in the light most favorable to the government. *National Engineering & Contracting Co. v. OSHA*, 928 F.2d 762, 765 (6th Cir.1991). A district court's "denial of a motion to suppress will be affirmed on appeal if proper for any reason[,]" even one not relied upon by that court. *United States v. Barrett*, 890 F.2d 855, 860 (6th Cir.1989). Moreover, "[w]e must accept the findings of fact upon which the district court relied in dealing with suppression of evidence unless those findings are *clearly erroneous*." *United States v. French*, 974 F.2d 687, 691 (6th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1012, 122 L.Ed.2d 160 (1993). The ultimate determinations as to the legality of the stop and the existence of probable cause to search the vehicle are conclusions of law, which we review *de novo*. *See United States v. Fountain*, 2 F.3d 656, 661 (6th Cir.1993).

### III.

▮ Our inquiry into the legitimacy of an investigatory stop involves a two-pronged examination of its reasonableness. First, we determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion." *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir.1986), *cert. denied*, 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987). Second, we decide "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.*

### A.

▮ The Fourth Amendment requires that all "searches and seizures" be based upon probable cause. There are, however, certain "narrowly drawn exceptions" to the probable cause requirement, including the investigatory detention, or *Terry* stop. *United States v. Sharpe*, 470 U.S. 675, 689, 105 S.Ct. 1568, 1577, 84 L.Ed.2d 605 (1985) (Marshall, J., concurring). A lawful *Terry* stop requires that the authorities be able to point to "specific and articulable facts" justifying their reasonable suspicion that the suspect has been or is about to be involved in criminal activity. *United States v. Sokolow*, 490 U.S. 1, 12, 109 S.Ct. 1581, 1588, 104 L.Ed.2d 1 (1989); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Even if each specific fact relied upon by the authorities to make a *Terry* stop would not be a basis for suspicion when considered in isolation, the reasonable suspicion necessary to support an investigatory stop can still be found when it is "based upon an assessment of *all* circumstances surrounding the actions of a suspected wrongdoer[,]" including those facts that would arouse suspicion only in someone experienced in law enforcement matters. *United States v. Knox*, 839 F.2d 285, 290 (6th Cir.1988), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). Furthermore, "[a]n informant's tip is sufficient to establish reasonable suspicion; [such suspicion] need not be based exclusively on an officer's personal observations." *Hardnett*, 804 F.2d at 356.

▮ Reymundo contends that the DEA agents did not have articulable facts to support stopping the semi-truck that he was driving. He argues that even if the stop of Tomas and Garcia was reasonable, it would amount to "guilt by association" to conclude the same about his own stop. The magistrate judge specifically found, however, that the agents did not stop Reymundo because of his "mere propinquity" to other criminal suspects. Considering the "totality of the circumstances," the magistrate judge found the information relayed by the Texas DEA

---

1. Since neither the court below nor this court relies on Reymundo's consent to search, we need not adjudicate this contention.

agent, coupled with the facts gained from the surveillance, sufficient to give the Detroit law enforcement team a reasonable suspicion of ongoing criminal activity. The concerted activity of the four codefendants during the surveillance—including phone calls between room 159 and the Star, the close attention paid by all parties to the semi-truck, the retrieval of "packages" from the cab of the truck, the positive alert for marijuana by the dog upon the pick-up truck, and the fact that the two trucks departed at the same time and were traveling in close proximity—satisfied the magistrate judge that the agents had "specific and articulable facts" to support an investigatory stop of the semi-truck. We cannot say that the magistrate judge clearly erred in so finding.

### B.

 Reymundo argues that even if the initial stop was based upon reasonable suspicion of ongoing criminal activity, his treatment at the hands of the agents—being forced out of the truck at gunpoint, handcuffed, and placed in the back of an agent's car—resulted in a seizure that exceeded the bounds of the *Terry* stop's narrow exception to the Fourth Amendment and thus vitiated his consent to search. We need not address this argument, however, for we hold, as did the court below, that Agent Perman's discovery, made as a result of activity legitimate under the *Terry* doctrine, was unaffected by any illegality alleged by Reymundo to have occurred in obtaining the consent to search.[2]

 The general test for the allowable scope of law enforcement activity during a *Terry* stop is whether "the surrounding circumstances give rise to a justifiable fear for personal safety." *Hardnett*, 804 F.2d at 357. Courts have generally upheld law enforcement actions taken during investigatory stops, including making such stops "with weapons drawn[,]" when those actions are "reasonably necessary for the protection of the officers." *Id.* (Internal quotation marks

omitted). In a situation where the officers have reason to believe the occupants of a vehicle are armed and dangerous, "officers certainly may ... order occupants out of a car." *Id.* at 358.

 Moreover, there is no "rigid time limitation on *Terry* stops." *Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1575. In rejecting a per se rule that a 20–minute detention is too long, the Supreme Court has emphasized "the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.* If the authorities are pursuing a diligent course of investigation "likely to confirm or dispel their suspicions quickly," courts "should not indulge in unrealistic second-guessing." *Id.* at 686, 105 S.Ct. at 1575.

 We conclude that, under the evidence presented to him, the magistrate did not err in finding that Agent Perman, in standing on the step on the outside of the semi-truck and looking inside for an additional person, did not go beyond that which was allowed by the *Terry* stop.

### C.

 Having concluded that the ruling below—that Agent Perman could legitimately, under the *Terry* doctrine, look inside the semi-truck to determine whether any persons remained therein—was not erroneous, we find that Agent Perman's smelling the marijuana then constituted probable cause to believe that there was marijuana in the vehicle. Once this probable cause existed, a search warrant was not necessary. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Barrett*, 890 F.2d at 862.

### IV.

We therefore conclude that the court below did not err in its ruling that evidence of marijuana in the semi-truck should not be suppressed.

---

2. Actually, Reymundo only argues that there was no basis for the *Terry* stop and that, even if there was, the consent to search was ineffective. He does not argue that, even if there was a proper *Terry* stop, the activity of agent Perman, which resulted in the discovery of the marijuana in the vehicle, went beyond that allowed upon a proper *Terry* stop. We conclude, in any case, that agent Perman's activity was, as the magistrate judge found, authorized as part of the *Terry* stop.

The judgment of the district court is **AFFIRMED**.