47 F.3d 1171
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Welby O. MULLINS, Jr.; Kerry Dean Coffey, Defendants-Appellants.
 Nos. 93-6642, 94-5004.
 United States Court of Appeals, Sixth Circuit.
 Feb. 16, 1995.
 
 Before: JONES and MILBURN, Circuit Judges; and COHN*, District Judge.
 MILBURN, Circuit Judge.
 
 
 1
 Defendants Kerry Dean Coffey (Case No. 93-6642) and Welby O. Mullins, Jr. (Case No. 94-5004) appeal the district court's order denying their motion to suppress evidence and their subsequent convictions based upon their conditional guilty pleas to one count of conspiracy to distribute and possess cocaine with the intent to distribute in violation of 21 U.S.C. Sec. 846. In addition, defendant Coffey challenges the sentence imposed by the district court following his conditional guilty plea. On appeal, the issues are (1) whether the district court erred in denying defendants' motion to suppress the evidence seized and statements made following their arrest on February 18, 1993, and (2) whether the district court erred in sentencing defendant Coffey under the mandatory minimum provisions of 21 U.S.C. Sec. 841(b)(1)(B). For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 In early February 1993, approximately two weeks prior to the Terry-type stop that forms the basis of this case, Detective Ronnie Ray of the Drug Enforcement, Special Investigations Unit of the Kentucky State Police developed a relationship with a confidential informant. During this two week period, the informant supplied Detective Ray with information relating to two other investigations. The informant also told Detective Ray that he had purchased cocaine from defendant Mullins in the past.
 
 
 3
 On February 18, 1993, the informant contacted Detective Ray and told him that defendant Mullins had told the informant that Mullins and an individual named "Deanie" were going to purchase a substantial amount of cocaine from Danny Bugg. The informant also told Detective Ray that Mullins and "Deanie" were enroute from McKinney, Kentucky, to purchase the cocaine from Bugg, and "Deanie" would be driving a red Chevrolet van with a black stripe around it, with Mullins as a passenger.
 
 
 4
 Prior to receiving this information, Detective Ray had personally arrested Mullins for the possession of cocaine and marijuana, and he was aware that Mullins had been convicted of trafficking in cocaine. Further, Detective Ray also knew that Bugg had been the subject of an investigation into drug trafficking and that he had a reputation as a drug trafficker. In addition, Detective Ray also knew the location of Bugg's residence, and he was aware that Mullins had sold drugs to the confidential informant on a previous occasion.
 
 
 5
 After receiving the information from the confidential informant, Detective Ray and Detective Jim Henderson of the Kentucky State Police drove toward Bugg's residence. During the late afternoon of February 18, 1993, Detectives Ray and Henderson spotted a red Chevrolet van with a black stripe around it. The van was coming from the direction of McKinney, Kentucky, and was being driven in the direction of Bugg's residence.
 
 
 6
 Detectives Ray and Henderson observed the van pull into the driveway of Bugg's residence. The van stayed a short time, about two minutes, and then pulled out, leading the detectives to conclude that there was no one at Bugg's residence.
 
 
 7
 Detectives Ray and Henderson then observed the van proceed down a country lane called Cummins Ferry Road. Detectives Ray and Henderson were in contact with Captain Leslie Williams of the Harrodsburg Police Department via a cellular telephone. The officers had a discussion as to why the van would proceed down Cummins Ferry Road. During the discussion, both Detective Henderson and Captain Williams informed Detective Ray that Bugg owned a farm in that immediate area. Detective Henderson told Detective Ray that he knew about Bugg's farm from a previous investigation, which had occurred a few months earlier. Based upon their discussion, the detectives concluded that Mullins and "Deanie" were enroute to Bugg's farm to purchase the cocaine. However, because Cummins Ferry Road was a narrow road with few side roads, Detectives Ray and Henderson were concerned that Mullins and "Deanie" would discover their presence and they ended their surveillance of the red Chevrolet van.
 
 
 8
 Nevertheless, on the basis of what he had observed that evening, Detective Ray was satisfied that the information he had received from the confidential informant was accurate and he decided that the next time he saw the red Chevrolet van he was going to stop it. Subsequently, the red Chevrolet van was spotted leaving the vicinity of Bugg's farm and heading towards McKinney, Kentucky. Because Detectives Ray and Henderson were some distance away, Detective Ray contacted Captain Williams and requested that the Harrodsburg Police stop the van.
 
 
 9
 Responding to Detective Ray's request, the Harrodsburg Police stopped the red Chevrolet van. The van was stopped and held for the purpose of permitting Detective Ray to ask for consent to search the van.
 
 
 10
 Captain Williams was not present at the time the van was stopped; however, he arrived at the scene approximately one to two minutes later. At the time of Captain Williams arrival, both Mullins and Coffey had gotten out of the van. Coffey was standing in front of the van and Mullins was seated on the front fender or hood of one of the police cruisers.
 
 
 11
 Captain Williams approached Coffey and asked him who owned the van. Coffey told captain Williams that the van was notarized in his name. Captain Williams informed Coffey that he had no search warrant but then asked for consent to search the van. Coffey told Williams that he could not search the van without a warrant. However, Coffey advised Captain Williams that there was some "pot" (marijuana) located in the van between the rider's seat and the driver's seat and that Coffey would give it to him. J.A. 122. Coffey then walked over to the van, retrieved a bag of marijuana from the van, and gave it to Captain Williams.
 
 
 12
 Captain Williams estimated that approximately two to three marijuana cigarettes could be made from the marijuana in the bag. After receiving the bag of marijuana from Coffey, Captain Williams immediately placed Coffey and Mullins under arrest for possession of marijuana. Subsequent to the arrest, Mullins was searched and approximately $8000 was found on his person.
 
 
 13
 At this time, Detective Ray, who was on his way to the scene, was advised of the arrests of Coffey and Mullins for possession of marijuana. Detective Ray responded that that was enough to get in the vehicle and search it.
 
 
 14
 Detective Ray arrived at the scene approximately 15 minutes after the original stop of the van. Captain Williams advised Detective Ray of the arrests of Coffey and Mullins and of the $8000 which had been found on Mullins' person. Detective Ray then asked for a drug sniffing dog to be brought to the scene.
 
 
 15
 After the dog reacted positively to something, Detective Ray decided to search the van incident to the arrests of Coffey and Mullins. During the search, Detective Ray found a heavy bag lying on the floor of the van between the driver's seat and the rear seat. Detective Ray looked into the bag and saw a white substance wrapped in duct tape, which was consistent with the presence of cocaine.[1]
 
 
 16
 After their arrests by Kentucky authorities for possession of marijuana, Coffey and Mullins were released pursuant to a cooperation agreement with the Kentucky State Police. However, they fled the state without cooperating with the state police and were arrested several months later in Texas.
 
 B.
 
 17
 After their arrests in Texas, a federal grand jury indicted defendants Coffey and Mullins on July 1, 1993, charging them with one count of conspiracy to distribute and to possess cocaine with the intent to distribute in violation of 21 U.S.C. Sec. 846 (Count 1) and one count of possession of cocaine with the intent to distribute in violation of 21 U.S.C. Sec. 841(a)(1) (Count 2).
 
 
 18
 Subsequently, defendants filed a motion to suppress all the evidence which was seized and the statements made as the result of the stop and search of their vehicle on February 18, 1993. Following an evidentiary hearing on the motion to suppress, which was held on August 9, 1993, the district court issued a memorandum opinion and order on September 15, 1993, denying defendants' motion to suppress. The district court concluded that under Alabama v. White, 496 U.S. 325 (1990), Detective Ray had grounds justifying an investigative stop of the red Chevrolet van based upon his independent corroboration of the confidential informant's tip. The district court further found that defendant Coffey's spontaneous confession concerning the presence and location of the marijuana in the Chevrolet van gave Captain Williams probable cause for the arrest of defendants at that point. Lastly, the district court found that once the law enforcement officers had probable cause to arrest defendants, the subsequent search of the van was a lawful search incident to arrest, and, furthermore, that pursuant to Nix v. Williams, 467 U.S. 431 (1984), the cocaine was also admissible because it would have been inevitably discovered when the van was inventoried and impounded based upon the procedures used by the Harrodsburg Police Department.
 
 
 19
 Thereafter, on October 1, 1993, defendants entered conditional guilty pleas to the charges in Count 1 of the indictment, preserving their right to challenge the district court's denial of their motions to suppress. Defendants were sentenced on December 17, 1993. Defendant Mullins was sentenced to 294 months' imprisonment to be followed by eight years of supervised release. Defendant Coffey was sentenced to 60 months' imprisonment to be followed by five years of supervised release. These timely appeals followed.
 
 II.
 A.
 
 20
 Defendants argue that the district court erred in denying their motions to suppress the evidence seized and statements made following the investigatory stop of the red Chevrolet van on February 18, 1993. Defendant Mullins asserts that there were no legal grounds for the investigatory stop on February 18, 1993. Defendant Coffey likewise asserts that the district court erred in concluding that the authorities had a reasonable suspicion supported by articulable facts that cocaine was present in the red Chevrolet van, thereby justifying the Terry investigatory stop of February 18, 1993.
 
 
 21
 When reviewing a district court's denial of a "motion to suppress evidence, we must consider the evidence in the light most favorable to the government." United States v. Garza, 10 F.3d 1241, 1245 (6th Cir.1993). Further, "[w]e must accept the findings of fact upon which the district court relied in dealing with the suppression of evidence unless those findings are clearly erroneous." United States v. French, 974 F.2d 687, 691 (6th Cir.1992), cert. denied, 113 S.Ct. 1012, and cert. denied, 113 S.Ct. 1431 (1993). However, the district court's ultimate determinations, such as the legality of an investigatory stop or the existence of probable cause, are conclusions of law, which we review under a de novo standard. United States v. Baro, 15 F.3d 563, 566 (6th Cir.), cert. denied, 115 S.Ct. 285 (1994); Garza, 10 F.3d at 1245 (citing United States v. Fountain, 2 F.3d 656, 661 (6th Cir.), cert. denied, 114 S.Ct. 608 (1993)).
 
 
 22
 "The Fourth Amendment requires that all 'searches and seizures' be based upon probable cause. There are, however, certain 'narrowly drawn exceptions' to the probable cause requirement, including the investigatory detention, or Terry stop. Garza, 10 F.3d at 1241. This court's evaluation of "the legitimacy of an investigatory stop involves a two-pronged examination of its reasonableness." Id. First, we must determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which give rise to a reasonable suspicion." United States v. Hardnett, 804 F.2d 353, 356 (6th Cir.1986), cert. denied, 479 U.S. 1097 (1987). Second, we must then decide "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." Id.
 
 
 23
 "In reviewing a challenged investigatory stop, 'the totality of the circumstances--the whole picture--must be taken into account.' " United States v. Barrett, 890 F.2d 855, 860 (6th Cir.1989) (quoting United States v. Cortez, 449 U.S. 471, 477 (1981)). Moreover, " '[i]n assessing the reasonableness of the stop, the facts are" judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search' " warrant a man of reasonable caution in the belief' that the action taken was appropriate?" ' " Id. (quoting Hardnett, 804 F.2d at 356 (quoting Terry v. Ohio, 392 U.S. 1, 222-23 (1968)).
 
 
 24
 "While the officer need not have probable cause to believe the individual has committed a crime or intends to commit a crime, the Fourth Amendment requires that the decision to stop the individual must be based on something 'more substantial than inarticulate hunches.' " United States v. Roberts, 986 F.2d 1026, 1029 (6th Cir.) (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)), cert. denied, 114 S.Ct. 271 (1993). See also United States v. Smith, 799 F.2d 704, 707 (11th Cir.1986) ("Investigative stops of vehicles are analogous to Terry-stops and are invalid if based upon only 'unparticularized suspicion or "hunch." ' " (quoting Terry, 392 U.S. at 27) (citation omitted). "Similarly, in United States v. Cortez, 449 U.S. 411, 417-18 (1981), the Court stated that a Terry investigative stop will be upheld where 'the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " United States v. Nersesian, 824 F.2d 1294, 1316 (2d Cir.) (parallel citations omitted), cert. denied, 484 U.S. 957, and cert. denied, 484 U.S. 958, and cert. denied, 484 U.S. 1061 (1987). Finally, our totality of the circumstances analysis must include a realistic assessment of the situation from the law enforcement officer's perspective. Barrett, 890 F.2d at 861. As the Supreme Court has stated:
 
 
 25
 From these data, a trained officer draws inferences and makes deductions ... that might well elude an untrained person.... Finally, the evidence thus collected must be seen and weighed not in terms of library analysis of scholars, but as understood by those versed in the field of law enforcement.
 
 
 26
 United States v. Cortez, 449 U.S. 411, 418 (1981).
 
 
 27
 In this case, the district court did not err in concluding that the law enforcement officers had a particularized and objective basis for suspecting that cocaine was present in the red Chevrolet van when they stopped it on February 18, 1993. Contrary to defendants' assertions, Detective Ray had a reasonable suspicion based upon specific and articulable facts that cocaine was present in the red Chevrolet van when he requested that Captain Williams make a Terry-type investigatory stop of the van.[2]
 
 
 28
 Defendants assert, however, that Detective Ray could not have relied on the tip he received from the confidential informant as the basis for his reasonable suspicion that cocaine was present in the van because Detective Ray had only developed a relationship with the informant and been receiving tips from the informant for approximately two weeks prior to the investigative stop of the red Chevrolet van. However, " '[a]n informant's tip is sufficient to establish reasonable suspicion; [such suspicion] need not be based exclusively on an officer's personal observations.' " Garza, 10 F.3d at 1245 (quoting Hardnett, 804 F.2d at 356); see also United States v. Barnes, 910 F.2d 1342, 1344 (6th Cir.1990) ("[T]he Court [has] clarified that Terry stops [are] also permissible where the stops related to a crime already completed and where the information supplying the reasonable suspicion came from another person rather than the officer's personal observation.") (citing Adams v. Williams, 407 U.S. 143, 147 (1972)). Thus, the confidential informant's tip could serve as the basis of the reasonable suspicion which justified the investigatory stop of the Chevrolet van.
 
 
 29
 Moreover, defendants' arguments simply miss the mark. In this case, Detective Ray did not simply rely on the tip he received from the confidential informant. Rather, Detectives Ray and Henderson corroborated the confidential informant's tip with their own independent observations which confirmed the accuracy of the information conveyed by the informant.
 
 
 30
 We note that the tip which Detective Ray received from the confidential informant was consistent with and corroborated by Detective Ray's own personal knowledge. The confidential informant told Detective Ray that defendant Mullins and an individual named "Deanie" were travelling from McKinney, Kentucky, to purchase cocaine from Bugg. At the time he received the tip, Detective Ray was aware that Mullins had been convicted for trafficking in cocaine and Detective Ray had personally arrested Mullins for the possession of cocaine on a previous occasion. Detective Ray also knew that Bugg had been the subject of an investigation into drug trafficking and had a reputation as a drug trafficker.
 
 
 31
 Moreover, shortly after receiving the informant's tip, Detectives Ray and Henderson spotted a van matching the description given by the informant, a red Chevrolet van with a black stripe around it, coming from the direction of McKinney, Kentucky, and being driven in the direction of Bugg's residence. Detectives Ray and Henderson kept the red Chevrolet van under surveillance and saw it pull into the driveway of Bugg's residence. The van left after an extremely short period of time, and Detectives Ray and Henderson, who were keeping the van under surveillance, followed it to the vicinity of Cummins Ferry Road, at which point Detectives Ray and Henderson abandoned their surveillance of the van out of fear of being detected by its occupants.
 
 
 32
 Furthermore, as the van was being driven down Cummins Ferry Road, Detective Ray, who was in contact with Captain Williams of the Harrodsburg Police Department during this period by cellular telephone, learned from both Detectives Henderson and Williams that Bugg owned a farm in the immediate vicinity of Cummins Ferry Road. Where there is at least some communication between different law enforcement officials, the collective knowledge of the officers determines the existence of reasonable suspicion or probable cause. See United States v. Allison, 953 F.2d 1346, 1350 (11th Cir.1992).
 
 
 33
 After further discussion, the law enforcement officers decided that the red Chevrolet van was being driven to Bugg's farm to purchase the cocaine. Accordingly, Detective Ray requested that the Harrodsburg Police stop the van if they spotted it so that a request could be made to search the van. Detective Ray's request for a Terry-type investigative stop of the van was supported by a reasonable suspicion; namely, an independently corroborated tip from a confidential informant which also contained information consistent with the personal knowledge of the law enforcement officers.
 
 
 34
 Defendants argue, however, that because Detective Ray was not able to corroborate all the information received from the confidential informant by the time the van was stopped, he lacked the reasonable suspicion necessary to stop the van. This argument is meritless. The confidential informant also told Detective Ray that "Deanie" would be driving the van and that Mullins would be a passenger in the van. Defendants assert that because the three law enforcement officials were unable to determine who was in the van prior to the Terry-type investigative stop of the van, the stop was impermissible. Here, however, Detectives Ray and Henderson were able to corroborate significant aspects of the information received from the confidential informant based upon their own independent investigation and observations. See Alabama v. White, 496 U.S. 325, 331-32 (1990) (a corroborated anonymous tip, even though not corroborated in every detail, did exhibit sufficient indicia of reliability to justify investigative stop).
 
 
 35
 Furthermore, contrary to defendant's assertions, none of the events which occurred between the time the Harrodsburg Police stopped the red Chevrolet van and the time that Captain Williams arrested them for possession of marijuana violated their Fourth Amendment rights. Defendants assert that because the Harrodsburg police approached their van with guns drawn and ordered them out of the vehicle, the investigative stop of their vehicle became an unlawful arrest. "However, the mere use or display of force in making a stop will not necessarily convert a stop into an arrest." Hardnett, 804 F.2d at 357.
 
 
 36
 Furthermore, the events which occurred between the time that the red Chevrolet van was stopped and the time that defendants were arrested for possession of marijuana did not amount to a seizure of defendants under the Fourth Amendment. A seizure, within the meaning of the Fourth Amendment, "occurs only when a reasonable person, in view of the circumstances surrounding the encounter with law enforcement officials, believes he is not free to leave." United States v. Winfrey, 915 F.2d 212, 216 (6th Cir.1990), cert. denied, 498 U.S. 1039 (1991). In this case, there is no indication that defendant Coffey's driver's license or registration had been taken by the police or that defendants had been ordered to remain. See id. Further, Captain Williams testified that if at the time defendants were stopped, "they had requested to leave, I am sure that they would have been allowed to leave. They were not under arrest at that time." J.A. 133. Captain Williams further testified, "This [defendants requesting to leave] did not happen. The situation didn't arrive." J.A. 134.
 
 
 37
 In addition, Captain Williams did not violate defendants' Fourth Amendment rights when he asked defendant Coffey if he would consent to a search of the van. Captain Williams informed defendant Coffey that the police did not have a search warrant for the vehicle, and defendant Coffey was free to either consent or deny consent for the search. Accordingly, Captain Williams "did nothing wrong in asking [defendant] if he would consent to a search of the [van]." United States v. Dunson, 940 F.2d 989, 994 (6th Cir.1991), cert. denied, 112 S.Ct. 1488 (1992). " 'The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation.' " Id. (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)).
 
 
 38
 Furthermore, Detective Ray's search of the red Chevrolet van for cocaine was a valid search incident to arrest. Once defendant Coffey admitted to Captain Williams that there was marijuana in the van and had actually retrieved the bag of marijuana from the inside of the van and had given it to Captain Williams, Captain Williams clearly had probable cause for a lawful warrantless arrest of defendants on charges of possession of marijuana.
 
 
 39
 "A police officer may search the passenger compartment of an automobile incident to the lawful custodial arrest of the occupant of the vehicle without a warrant or probable cause." United States v. Mans, 999 F.2d 966, 968 (6th Cir.) (citing New York v. Belton, 453 U.S. 454, 460 (1981)), cert. denied, 114 S.Ct. 567 (1993). Such a search incident to arrest may be performed "even if the arrestee has been separated from his car prior to the search of the passenger compartment." Id. (citing United States v. White, 871 F.2d 41, 44 (6th Cir.1989)). Accordingly, we conclude that the district court did not err in denying defendants' motion to suppress.[3]
 
 B.
 
 40
 Defendant Coffey argues that the district court erred in applying the mandatory minimum sentencing provision of 21 U.S.C. Sec. 841(b)(1)(B) at his sentencing. Defendant Coffey asserts that the district court's finding that he could reasonably foresee that Mullins would purchase a kilogram of cocaine was clearly erroneous and was not supported by the evidence. Defendant Coffey further asserts that the district court's conclusion that he could reasonably foresee that Mullins would purchase a kilogram of cocaine is inconsistent with the district court's conclusion that he was a minimal participant in the offense.
 
 
 41
 "A district court's findings of fact on the amount of cocaine for which a defendant is to be held accountable are accepted by this court unless the findings are clearly erroneous." United States v. Jenkins, 4 F.3d 1338, 1345-464 (6th Cir.1993), cert. denied, 114 S.Ct. 1547 (1994). Further, the district court's findings must be supported by a preponderance of the evidence. Id. (citing United States v. Walton, 908 F.2d 1289, 1300-01 (6th Cir.), cert. denied, 498 U.S. 906 and cert. denied, 498 U.S. 989 and cert. denied, 498 U.S. 990 (1990).
 
 
 42
 "A co-conspirator is not necessarily responsible for the total amount of cocaine involved in the conspiracy...." Jenkins, 4 F.3d at 1346. "Rather, a participant is responsible for other conspirators' conduct only if that conduct was reasonably foreseeable to him and in furtherance of the execution of the jointly undertaken criminal activity." Id.
 
 
 43
 Defendant Coffey testified at the sentencing hearing. Coffey denied that he actually knew that defendant Mullins was involved in drug trafficking, but he admitted that he "more or less suspected it." J.A. 260. Coffey further admitted that he had used cocaine "on occasion," and stated that he knew that Mullins "messed with cocaine." J.A. 264. Coffey also stated that he knew that Mullins had gone to the penitentiary for drug trafficking on one or two occasions.
 
 
 44
 Coffey described his relationship with Mullins as "friends, drinking partners." J.A. 258. Coffey stated that he did most of the driving for Mullins. Coffey testified that on his part, Mullins paid for vacations, drinks, fishing equipment and allowed Coffey access to his vans and motorcycles. In addition, Coffey admitted that he lived with Mullins for a period of time and paid no rent. Coffey also admitted that he never asked Mullins where he got the money to pay for things, however Coffey stated that he more or less suspected it was from drugs.
 
 
 45
 Coffey testified that he and Mullins travelled to Cincinnati on the night of February 17, 1993, and stayed overnight in the city because Coffey had a 9:00 a.m. court appearance there. Coffey stated that after his court appearance, Mullins told him that he wanted to go to Harrodsburg, Kentucky, that evening. Coffey admitted that he had suspicions as to why Mullins wanted to go to Harrodsburg on the night of February 18, 1993, but he stated that he never asked Mullins his reasons for wanting to travel to Harrodsburg because it was none of his business.
 
 
 46
 Finally, Coffey testified that he was surprised when he subsequently learned that a kilogram of cocaine had been seized from the van on February 18, 1993. Coffey admitted that on two or three previous occasions he had seen Mullins with one-half pound or a pound of cocaine, but that he never suspected that Mullins was dealing in quantities as large as a kilogram.
 
 
 47
 Following the sentencing hearing, the district court found that Coffey was "not a 'player,' but rather was a mere 'flunky' [in the drug distribution conspiracy], and as such he would be entitled to a minimal participant finding." J.A. 80. However, the district court also rejected Coffey's assertion that the one kilogram of cocaine involved in the conspiracy was not foreseeable to him. The district court found that the one kilogram of cocaine was reasonably foreseeable because Coffey admitted that on previous occasions, he had seen Mullins with a pound of cocaine. Further, Coffey admitted that he was aware of Mullins criminal record and strongly suspected that Mullins dealt in cocaine. In addition, the district judge explicitly rejected Coffey's testimony that he had no idea of the amount of drugs involved in the February 18, 1993 transaction.
 
 
 48
 In this case, the district court's finding that it was reasonably foreseeable to defendant Coffey that a kilogram of cocaine was involved in the offense was not clearly erroneous. First, it is undisputed that a kilogram of cocaine was seized from the red Chevrolet van on February 18, 1993. Thus, there is no issue as to the amount of cocaine involved in this case; the only issue is the foreseeability of that quantity to defendant Coffey.
 
 
 49
 Second, based upon defendant Coffey's testimony at the sentencing hearing, the district court's finding regarding foreseeability is not clearly erroneous. Based upon Coffey's testimony, it is apparent that Coffey was aware that Mullins was involved in cocaine trafficking and that Coffey had observed Mullins in possession of significant amounts of cocaine prior to February 18, 1993. Moreover, the amounts of drugs observed in Mullins' possession by Coffey prior to February 18, 1993, were not unreasonably different from the amount of drugs seized by the law enforcement officers on that date.
 
 
 50
 Third, we are required to give deference to the district court's finding that Coffey's testimony that he had no idea of the amount of drugs involved in the February 18, 1993 transaction was not credible. Here, the district court was present at the sentencing hearing and was able to observe Coffey's demeanor during his testimony. See United States v. Nelson, 918 F.2d 1268, 1272 n. 4 (6th Cir.1990) (" 'The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses....' ") (quoting 18 U.S.C. Sec. 3742(e)).
 
 
 51
 Furthermore, although defendant Coffey argues that he should be sentenced within the 30 to 37 month sentencing guideline range applicable to this case, based upon the district court's conclusion that he was a minimal participant in the offense, rather than being sentenced under the 60 month mandatory minimum sentencing provision of 21 U.S.C. Sec. 841(b)(1)(B), we conclude that the district court did not err in applying the 60 month mandatory minimum sentence. As is discussed above, the district court's finding that the one kilogram of cocaine was foreseeable to defendant Coffey is not clearly erroneous. Accordingly, the district court properly found that Coffey was subject to the statutory mandatory minimum sentence of five years', 60 months', imprisonment under 21 U,S,C, Sec. 841(b)(1)(B). Moreover, the district judge was required to apply the statutory mandatory minimum sentence; he could not depart downward on the basis of the sentencing guideline range. See United States v. Goff, 6 F.3d 363, 366-67 (6th Cir.1993) ("where a statutory mandatory minimum sentence and the guidelines conflict, the guidelines must yield, and the statutory minimum sentence prevails").[4]
 
 
 52
 Accordingly, we conclude that the district court's finding that the kilogram of cocaine seized from the red Chevrolet van on February 18, 1993, was reasonably foreseeable to Coffey, was supported by a preponderance of the evidence, and was not clearly erroneous.
 
 III.
 
 53
 For the reasons stated, the district court's judgments are AFFIRMED in all respects.
 
 
 
 *
 Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 It was subsequently determined that the bag contained one kilogram of cocaine
 
 
 [2]
 Defendants argue that the stop in this case was pretextual. However, the uncontradicted evidence in the record shows that this was a Terry-type investigative stop. Neither Detective Ray nor Captain Williams gave any other reason for stopping the red Chevrolet Van. In fact, Captain Williams testified that to his knowledge at the time the red Chevrolet Van was stopped, no traffic violation or infraction had been committed by either Coffey or Mullins. J.A. 127
 Furthermore, Captain Williams testified that the van was stopped to ask for consent to search the van because the law enforcement officers reasonably believed that the van contained cocaine. In that regard, the first thing Captain Williams did after arriving on the scene of the investigative stop and learning that defendant Coffey claimed ownership of the van, was ask for permission to search the van because the police had reason to suspect that the van contained narcotics. Thus, defendant's claim of pretext is meritless. None of the law enforcement officials involved in making the Terry-type investigative stop ever claimed that they were aware of any grounds to stop the red Chevrolet Van other than to ask for consent to search the vehicle for cocaine.
 
 
 [3]
 Defendants also complain about certain statements they made to the police following their arrests on February 18, 1993
 On February 18, 1993, defendant Mullins told Detective Ray that on that day he had received $34,000 from a individual in Lincoln County, Kentucky. Mullins stated that he had used the money to purchase one kilogram of cocaine from Bugg, which he expected to sell for $5,000 in profit.
 Mullins also told Detective Ray that he and Coffey had driven to Bugg's home and then his farm on February 18, 1993. At the farm residence, Mullins engaged in conversation with Bugg about the cocaine transaction. Mullins sent Coffey out to the van to get the $34,000. Coffey brought the money into the farm residence, gave it to Mullins, and Mullins gave the money to Bugg in exchange for the cocaine. Mullins and Coffey left Bugg's farm with the cocaine and were stopped by the police shortly thereafter.
 Detective Ray also stated that he had subsequent conversations with Mullins. During these conversations, Mullins told Detective Ray that he had purchased as much as 30 kilograms of cocaine from Bugg during the past several years.
 Also on February 18, 1993, Captain Williams took a statement from defendant Coffey about the marijuana which had been seized earlier that evening. Further, on February 22, 1993, defendant Coffey had a discussion with Detective Ray in which he admitted the details of the purchase of cocaine on February 18, 1993. Coffey admitted being in the red Chevrolet van, being in Bugg's residence, and going to the van and retrieving the $34,000.
 Defendants argue that the district court erred in failing to suppress these statements. However, in their briefs on appeal, they do not argue that the taking of these statements violated either their Fifth or Sixth Amendment rights under Edwards v. Arizona, 452 U.S. 973 (1981), and Miranda v. Arizona, 384 U.S. 436 (1966). Nonetheless, the district court found that Mullins' discussions, both custodial and non-custodial, with Detective Ray were voluntary attempts to cooperate with the authorities. Further, the district court found that Mullins waived his right to counsel during the custodial interrogation and did not reinvoke it. In addition, the district court concluded that Coffey's statements to Detective Ray were non-custodial. We agree, and conclude that Mullins' and Coffey's statements were admissible.
 Furthermore, to the extent that defendants seek to have their statements suppressed as "fruit of the poisonous tree" pursuant to Wong Sun v. United States, 371 U.S. 471 (1963), they also fail. We have concluded that the stop of defendant's van was a lawful Terry-type investigative stop and the search of the red Chevrolet Van was a valid search incident to a lawful arrest; therefore, defendants' statements are not suppressible as "fruit of the poisonous tree."
 
 
 [4]
 The Crime Bill of 1994 may affect this result in the future. However, as conceded by Coffey's counsel at oral argument, the bill took effect nine months after Coffey's sentencing and the bill is not retroactive