**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0609n.06
Filed: August 21, 2007

No. 06-5296

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| LaPEDRO FINLEY, | ) | |
| | ) | **O P I N I O N** |
| **Defendant-Appellant.** | ) | |
| | ) | |

Before:  **MOORE, COOK, Circuit Judges; and ADAMS,*** District Judge.

**KAREN NELSON MOORE, Circuit Judge.**  LaPedro Finley appeals the district court's

denial of his motion to suppress and its application of a two-point enhancement for possession of

a dangerous weapon.  For the reasons described below, we **AFFIRM** the district court's judgment

in all respects.

## I.  BACKGROUND

### A.  Factual Background

In late 2004, Officers Harold Tellez and Dean Fitzgerald were assigned to the Metro Gang

Unit in Memphis.  Because of previous complaints of gang and drug activity in the Southeast

_____

*The Honorable John R. Adams, United States District Judge for the Northern District of
Ohio, sitting by designation.

Precinct, Tellez and his partner (Officer Avery) were patrolling the area in an unmarked car on the evening of December 21, 2004. Officer Fitzgerald rode in a separate car.

Fitzgerald saw a "group of black males loitering around in a yard and on the street area in the middle of a rainstorm." Joint Appendix ("J.A.") at 99 (Suppression Hr'g Tr., Fitzgerald Test. at 53:23-25). Because the weather was cold and unpleasant, Fitzgerald thought this gathering seemed unusual, so he contacted Tellez and Avery to report the address where the group of men congregated and proceeded to pass by the group.

### 1. Officers' Initial Contact with Finley

Tellez drove toward the address. As he and Avery (who was in the passenger seat) approached the location, they noticed a white Mercury parked on the street parallel to the curb, about seven feet away from the crowd. The car was idle, and its lights were off. Although the car was near the group, Tellez recalled that it was parked away from the curb and may have been blocking traffic. Tellez further recounted, "As we were passing by the two occupants in the car, they kind of slumped down like they—they didn't want to be seen." J.A. at 77 (*id.* at 18:2-4). Tellez thought this behavior was suspicious, so he began to turn the car around after he passed the white Mercury. Once the officers began turning, the occupants opened the doors and got out of the car, "[w]hich really arouse[d Tellez and Avery's] suspicion even more." J.A. at 77-78 (*id.* at 18:23-19:3). At that point, the officers activated their car's police lights, got out of the car, and ordered the two men to stop. The men complied.

Tellez frisked the man who exited the car's driver-side door. After finding no weapons, Tellez asked the man for identification, which the man said was in the car. Fitzgerald, who had returned to the scene and had just finished frisking the group of people in the yard, walked with the

2

man. When they got to the car, the man fished a Tennessee driver's license from a coat in the back seat. The license revealed that he was LaPedro Finley.

While he was at the car with Finley, Fitzgerald smelled marijuana and signaled as much to Tellez, who then asked Finley for permission to search the car. Finley consented. Once Tellez leaned down to look inside the car, Finley fled on foot. Fitzgerald prevented Tellez from chasing Finley because Fitzgerald already had Finley's ID. Tellez and Fitzgerald searched the car and found a large bag containing five bricks of marijuana and about a quarter kilogram of cocaine powder. Officer Avery told them that he had seen Finley drop something in the yard as he fled. After searching the yard, the officers retrieved a bag containing crack cocaine.

## 2. Search of Finley's Residence

That night, the officers learned Finley's address from one of the people on the scene. They went to that address hoping to find Finley, who had absconded. They entered the residence using keys retrieved from the white Mercury and found several guns (including an AK-47), approximately 290 grams of cocaine, and over 2.3 kilograms of marijuana. All of these items were located in the attic, where a twelve-year-old boy was hiding. Finley's girlfriend, Clary Lee, was apparently present during this search, and after the officers found these items, they arrested her. Officer Fitzgerald later testified that the packaging of these drugs "was consistent with the packaging of the marijuana" in Finley's car. J.A. at 143 (Detention Hr'g Tr. at 20:4-10).[1]

---

[1]The Assistant United States Attorney prosecuting the case represented to the district court that Fitzgerald had so testified. The Joint Appendix does not contain any record of this testimony, nor does it contain any indication that Finley's counsel objected to the AUSA's representations.

### 3. Interrogation of Finley

On December 29, 2004, the United States District Court for the Western District of Tennessee issued a criminal complaint against, and an arrest warrant for, LaPedro Finley. The arrest warrant was executed that day, and Memphis Police officer Roger Nelson interviewed Finley after he was taken into custody. During this interview, Finley acknowledged that he had given officers permission to search his car, but denied that the drugs found in the car were his. Additionally, Finley admitted that he ran from the officers, claiming he did so because "he had about an ounce of weed in his pocket and he thought that he had an outstanding juvenile warrant." J.A. at 108-09 (Suppression Hr'g Tr., Nelson Test. at 72:25-73:7). Regarding the search of the residence, Finley admitted that he was living there at the time, and also admitted that the guns belonged to him. He denied that he owned the drugs, however, claiming that they belonged to his girlfriend.

## B. Procedural Background

After Finley was indicted on three counts of possession with intent to distribute an illegal substance, he moved to suppress "all evidence obtained as a result of his unlawful stop, detention and search of his belongings," as well as "any . . . statements where he was clearly in custody at the time he was questioned by the police." J.A. at 16-17 (Mot. to Suppress at 3-4). The district court held a suppression hearing on March 30, 2005, and heard testimony from Officers Tellez, Fitzgerald, and Nelson. It also heard testimony from Jeremy Robinson and Sally Robinson, the brother and mother, respectively, of the other man in Finley's car on December 21, 2004. The district court denied Finley's motion in all respects.

Finley entered a conditional guilty plea to all three counts on September 26, 2005, but reserved his right to appeal the denial of his motion to suppress. On February 27, 2006, the district

court held a sentencing hearing. Recognizing that the Sentencing Guidelines were advisory, the district court followed the Presentence Report's calculation of the applicable Guideline range, applying a two-point enhancement under Guideline § 2D1.1(b)(1) for possession of a dangerous weapon (namely, the firearms found in Finley's apartment).

Finley objected to the district court's application of the two-level enhancement, emphasizing that the firearms were not "relevant conduct" because they were found at a different location from the charged drugs and were not in any way tied to the drugs found in the car. The district court rejected this argument, concluding that the government had shown "that the firearm was pos[ess]ed and that the defendant was involved in the drug business and there was some connection." J.A. at 160 (Sentencing Hr'g Tr. at 26:20-22). Because the two-level enhancement applied, Finley was not eligible for a safety-valve reduction under Guideline § 5C1.2(a). Accordingly, the district court sentenced Finley to his mandatory minimum of sixty months of incarceration. Finley timely filed his notice of appeal on March 1, 2006.

## II. ANALYSIS

### A. Jurisdiction

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231. We have jurisdiction over Finley's appeal from the district court's judgment under 18 U.S.C. § 3742(a).

### B. Denial of Motion to Suppress Evidence

#### 1. Standard of Review

"When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *United States v. Foster*, 376 F.3d 577, 583

5

(6th Cir.), *cert. denied*, 543 U.S. 1012 (2004) (internal quotation marks and citation omitted). We review all evidence in the light most favorable to the district court's decision. *Id.*

### 2. Analysis

Although the district court analyzed the officers' interaction with Finley as a traffic stop under *Whren v. United States*, 517 U.S. 806 (1996), we believe that *Terry v. Ohio*, 392 U.S. 1 (1968), controls. "*Terry* . . . permits a police officer briefly to detain a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). To determine whether an investigatory detention comports with the Fourth Amendment, we apply a two-step analysis: First, we determine whether, under the totality of the circumstances, "'there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion.'" *Id.* (quoting *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993)). If the answer is affirmative, we determine "'whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.'" *Id.* (quoting *Garza*, 10 F.3d at 1245) (alteration in original).

The officers' encounter with Finley satisfies both prongs of this test. The totality of the circumstances illustrates that the officers had reasonable suspicion to believe that criminal activity may have been afoot. The officers on the task force were assigned to an area riddled with crime and gang violence and had recently been called into the neighborhood because residents were complaining about drug dealing. Tellez and Avery approached the house that Finley was parked in

6

front of because they had received a call from Fitzgerald reporting a suspicious situation (a group of young men standing around in front of a house while the weather was cold and rainy). As they neared the house, they noticed two men sitting in a car parked in front of the house with the engine running. When these men saw that Tellez and Avery were police officers, they slumped down in their seats to avoid being seen, and when Tellez turned his car around to approach them again, they quickly exited the car. Tellez testified that his experience has been that such behavior generally indicates that the car's occupants were trying to distance themselves from something inside the car.

Each of these facts, on its own, might not be sufficient to establish reasonable suspicion. Controlling precedent, however, indicates that each is relevant when considering the totality of the circumstances. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that the fact that the events took place in a high-crime area is relevant under the *Terry* analysis); *United States v. Bailey*, 302 F.3d 652, 659 (6th Cir. 2002) (same); *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir.), *cert. denied*, 127 S. Ct. 752 (2006) (noting that a defendant's furtive movements and other evasive behavior are pertinent in determining whether officers' suspicion was reasonable); *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (officers may rely on their experience in determining whether behavior appears suspicious). Each of these factors exists here, so we conclude that the officers had reasonable suspicion to believe that criminal activity may have been afoot.

Because the government satisfies the first step of the *Terry* analysis, we consider the second. We conclude that the officers did not violate Finley's Fourth Amendment rights, as the officers' intrusion upon Finley's liberty was not unreasonable given the circumstances. We have previously recognized that "upon making the stop, 'the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the

7

officer's suspicions.'" *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984)).  Further, "[l]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, or by putting questions to him if the person is willing to listen." *Foster*, 376 F.3d at 584 (internal quotation marks and alterations omitted).

Here, the officers' intrusion upon Finley's liberty was de minimis and lasted no longer than necessary for the officers to investigate their suspicions.  After Finley exited the car and the police activated their car's blue lights, Officer Tellez ordered Finley to stop.  Officer Tellez then approached Finley, asked him for identification, and conducted a protective pat-down to determine whether Finley was armed.  When Finley said his identification was in his car, Officer Fitzgerald followed him to the car, where he smelled marijuana.  Officer Tellez asked Finley for permission to search the car, which Finley granted.

Once the search began, Finley fled.  The officers never physically detained Finley; their only restraints on his freedom of movement were their command that he stop walking away from the car and their ensuing request for identification.  Accordingly, we conclude that the degree of intrusion on Finley's liberty was reasonably related to the officers' suspicion.

For these reasons, we conclude that the officers' initial contact with Finley did not violate the Fourth Amendment.  Finley offers no independent basis for suppressing the fruits of the search or his statements to officers, contending only that they were tainted by the unlawful initial encounter. Because the initial encounter was constitutional, there is no basis for suppressing the seized evidence or Finley's statements to officers after his arrest.

**C. Two-Level Sentencing Enhancement for Possession of a Dangerous Weapon**

Finley next challenges the district court's imposition of a two-point enhancement under United States Sentencing Guideline § 2D1.1(b)(1) for possession of a dangerous weapon during a drug offense. The district court concluded that the enhancement applied because the government had "show[n] that the firearm was pos[ess]ed and that the defendant was involved in the drug business and there was some connection." J.A. at 160 (Sentencing Hr'g Tr. at 26).

**1. Standard of Review**

When reviewing the district court's application of the Sentencing Guidelines, we apply the same standards of review that applied before *United States v. Booker*, 543 U.S. 220 (2005). *United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005). More specifically, we review for clear error the district court's findings of fact, *id.*, but review de novo mixed questions of law and fact, *United States v. Cousins*, 469 F.3d 572, 575 (6th Cir. 2006).

**2. Analysis**

Guideline § 2D1.1(b)(1) calls for a two-point enhancement "[i]f a dangerous weapon (including a firearm) was possessed."[2] Application Note 3 states, "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Putting this Guideline into practice, we have held that "[a]n enhancement under § 2D1.1(b)(1) is proper only if the government establishes, by a preponderance of the evidence, that (1) the defendant possessed a dangerous weapon (2) during the commission of a drug-trafficking offense." *United States v. Moses*, 289 F.3d 847, 850 (6th Cir. 2002). If the government meets its

---

[2]The PSR applied the 2004 version of the United States Sentencing Guidelines. All quotations from the Guidelines are taken from the 2004 version.

burden, then "the weapon is presumed to have been connected to the defendant's offense." *Id.* The

defendant can rebut this presumption by establishing by a preponderance of the evidence the defense

identified in Application Note 3—that it is clearly improbable that the weapon was connected to the

offense. *Id.*[3]

We have previously clarified that the government need not show that the defendant possessed

the weapon during the *commission of the offense*; instead, it must show only that the weapon was

possessed during "relevant conduct," which "includes 'all acts and omissions . . . that were part of

the same course of conduct or common scheme or plan as the offense of conviction.'" *United States*

*v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003) (quoting U.S.S.G. § 1B1.3(a)(2)). Here, the weapons

in question were found not with the drugs that were found in Finley's car and charged in the

indictment, but rather with the drugs found in Finley's residence after he fled. Thus, to determine

whether Finley possessed the weapons during "relevant conduct," we must determine whether the

drugs found in the residence were part of the same course of conduct or common scheme or plan as

Finley's possession of drugs in his white Mercury on December 21, 2004. When determining

whether two acts were part of the "same course of conduct," we consider the following factors: (1)

the similarity of the acts; (2) the repetitions of the acts or offenses; and (3) the time interval between

the acts. *Id.* Similarly, for two acts to be part of a "common scheme or plan," they "must be

substantially connected by at least one common factor such as 'common victims, common

---

[3]The government misconstrues Finley's argument when it suggests that Finley bears the burden of proving that the firearm was *not* connected to the offense. That standard might apply if Finley were challenging the district court's refusal to grant him a reduction under § 5C1.2(a)'s "safety valve" provision. *United States v. Bolka*, 355 F.3d 909, 912 (6th Cir. 2004). Finley, however, challenges the district court's imposition of the § 2D1.1(b)(1) enhancement itself. Although reversal of the § 2D1.1(b)(1) enhancement might ultimately lead to a safety-valve reduction, the two inquiries are separate. *See id.* at 914-15.

10

accomplices, common purpose, or similar *modus operandi*.'" *Id.* at 520-21 (quoting *United States v. Hill*, 79 F.3d 1477, 1481 (6th Cir.), *cert. denied*, 519 U.S. 858 (1996)).

First, we must determine whether Finley possessed the drugs found in the residence.[4] When the officers searched Finley's apartment on December 21, 2004, they found drugs in the attic with the weapons, and the drugs were packaged the same way as those found in Finley's car. Although the district court did not offer any clear findings of fact, the Joint Appendix in this case demonstrates by a preponderance of the evidence that Finley constructively possessed the drugs in the attic. Three primary reasons support this conclusion. First, Finley admitted that he was living in the residence where the officers found the marijuana. Second, the key ring pulled from the white Mercury contained keys to that residence. Third, the marijuana was found in the same space (the attic) as other items of which Finley acknowledged ownership (the guns). Because the government may establish constructive possession of an item by demonstrating the defendant's "dominion over the premises where the item is located," *United States v. Darwich*, 337 F.3d 645, 665 (6th Cir. 2003), the aforementioned three reasons, taken together, illustrate that Finley constructively possessed the marijuana in the residence.

The next issue we must decide is whether Finley's possession of the drugs in the car and the possession of the drugs in the house were similar enough and close enough in time to be part of the same "course of conduct." We conclude that they were. Officers found the drugs in the residence hours after they found the drugs in Finley's car, and the Joint Appendix indicates that the drugs in both locations were packaged similarly. Finley's possession of the drugs in the apartment is

---

[4]Finley argued to the district court that the drugs in the apartment belonged to his girlfriend Clary Lee. Nonetheless, the issue here is whether Finley *possessed* the drugs, not whether he owned them.

11

therefore "relevant conduct" under the Sentencing Guidelines. And because Finley possessed dangerous weapons in the same location as these drugs, the district court did not err in applying the § 2D1.1(b)(1) enhancement. *Faison*, 339 F.3d at 520-21 (weapons and drug proceeds and paraphernalia found together fourteen months after end of charged conspiracy were relevant conduct justifying § 2D1.1 enhancement); *United States v. Mitchell*, 63 F. App'x 224, 228-30 (6th Cir. 2003) (unpublished) (affirming enhancement when, months after the charged conduct, officers found the gun with uncharged drugs); *see also Davidson*, 409 F.3d at 312-13 (affirming application of the enhancement to a defendant convicted of attempting to manufacture methamphetamine when the gun was found in the same residence as the drugs); *United States v. Keszthelyi*, 308 F.3d 557, 578-79 (6th Cir. 2002) (affirming application of the enhancement to a defendant convicted of distributing drugs out of his home when the gun was found in his home); *Hill*, 79 F.3d at 1485-86 (enhancement affirmed when weapon was found in same house as the charged drugs). Further, Finley has provided no reason to conclude that it was clearly improbable that his possession of the guns was connected with his possession of the drugs. Thus we reject Finley's challenge to his sentence.

## III. CONCLUSION

For the aforementioned reasons, we AFFIRM the district court's judgment.