NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0178n.06

Case Nos. 13-5101/5119

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Mar 06, 2014 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE WESTERN |
| ALFREDO CARRILLO-ALVARDO (13- | ) | DISTRICT OF KENTUCKY |
| 5101) and JUAN LANDEROS-SANDOVAL | ) |  |
| (13-5119), | ) |  |
|  | ) |  |
| Defendants-Appellants. | ) | **O P I N I O N** |

BEFORE: ROGERS, McKEAGUE, and WHITE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Juan Landeros-Sandoval and Alfredo Carrillo-Alvardo were found guilty of conspiring to possess with the intent to distribute 1,000 kilograms or more of a mixture or substance containing a detectable amount of marijuana and of aiding and abetting such a conspiracy. They raise multiple arguments on appeal regarding whether the police had reasonable suspicion to stop their vehicles, whether the evidence establishing their guilt was sufficient, whether Landeros-Sandoval's prior felony drug conviction needed to be pleaded in the indictment and proven to the jury beyond a reasonable doubt, and whether the district court erred by not providing Carrillo-Alvardo a minor role adjustment when it imposed his sentence. For the following reasons, we **AFFIRM** the district court.

## I.      Facts

At approximately 7 p.m. on December 15, 2010, Officer Culver ("Culver") of the Louisville Metro Police Department received a tip from an informant that a tractor–trailer, carrying a large load of marijuana, would be delivered at an auto repair shop in Louisville, Kentucky.  This was not the first time that Culver had worked with the informant.  The informant had previously assisted another investigation.  The auto shop was also known to the police, and had been under continuous investigation since 2009 as a suspected "chop shop" and a distribution point for drugs.

Upon receiving the informant's tip, Culver requested assistance.   Detective Keller ("Keller"), Sergeant O'Toole ("O'Toole"), Detective James ("James"), Detective Morgan ("Morgan"), and other officers responded.  Keller, O'Toole, James, and Morgan each have over 10 years of law enforcement experience and significant experience in narcotics investigations. At local staging areas, the officers were briefed on the investigation—many had been previously briefed on the investigation as part of their regular duties—and on the informant's tip.  Culver also informed the officers that two other detectives had already set up surveillance and had confirmed that a tractor-trailer matching the informant's description was on the property.

Following the briefings, Culver left to have the search warrant for the property signed, and Keller and O'Toole took up a surveillance position near the auto shop.  They could see the road leading to the property, and any vehicles that might be entering or leaving the property.  As it was relatively late and after business hours, all of the other shops along the road were closed. The weather was bitterly cold and alternated between rain and sleet.

While Keller and O'Toole monitored the road, another officer, Detective Lee ("Lee"), took up surveillance on foot with binoculars near the property and reported what he saw by radio

to the other officers. Lee observed containers being unloaded from the tractor-trailer with a forklift, though he could not tell precisely what was in the containers or whether the other vehicles on the property were being loaded.

Approximately an hour after Keller and O'Toole had taken up their position, Lee reported several vans leaving through the gate of the auto shop. No other vehicles had been observed on the road in the previous hour. Shortly after Lee's warning, Keller and O'Toole observed two white cargo vans, two minivans, and a sedan traveling from the auto shop. The vans split into two groups. The first group, which included a white cargo van and minivan, departed together. The police followed, and after observing the vehicles driving together over the course of several miles, signaled for them to pull over. The officers reported over the radio that the vehicles were slow to stop. When they finally did, the police smelled the odor of marijuana from outside of the cargo van, and promptly discovered that it was packed with marijuana.

The second group of vehicles, including another white cargo van, driven by Juan Landeros-Sandoval ("Landeros-Sandoval"), and followed closely by a gray Honda Odyssey minivan, driven by Alfredo Carrillo-Alvardo ("Carrillo-Alvardo"), proceeded to a local freeway. Keller and O'Toole followed in an unmarked vehicle and requested assistance from other officers. James and Morgan responded and also began to follow. Over the course of a few miles, Carrillo-Alvardo's minivan maintained a close distance behind Landeros-Sandoval's cargo van, executed lane changes jointly, and made multiple turns together. Officers testified at the suppression hearing and at trial that it is common for drug traffickers to have a "chase car" shadow another car to provide protection and to ensure the delivery of the drugs. This is commonly referred to as driving in "tandem."

Although neither officer had witnessed criminal activity or a traffic violation, Keller and O'Toole signaled for the cargo van to pull over, which it promptly did. Carrillo-Alvardo's minivan continued along the road followed by James and Morgan. Keller and O'Toole approached Landeros-Sandoval's cargo van, and upon nearing it, the officers smelled a strong odor of marijuana. The interior of the cargo van was subdivided with the cargo compartment separated from the driver's compartment by wire mesh. From the front of the vehicle, through the mesh, the officers observed large bundles commonly used to store marijuana stacked from the floor to the roof. The total amount of marijuana is estimated to have weighed over a ton.

Following the stop of Landeros-Sandoval's vehicle, Morgan turned on his lights and siren and signaled for Carrillo-Alvardo to pull over. At this point, Carrillo-Alvardo had not committed any traffic infractions, nor had anyone witnessed him engaging in criminal activity. Carrillo-Alvardo continued driving for a quarter of a mile before stopping. He voluntarily exited the vehicle, but appeared nervous to the officers. Approximately a minute later, after James and Morgan learned by radio about the marijuana in Landeros-Sandoval's cargo van, they arrested Carrillo-Alvardo.

James subsequently searched Carrillo-Alvardo's minivan. Police recovered from it a pen used to detect counterfeit money and a piece of paper with the name "Sergio Landeros-Sandoval" written on it. Although James did not smell marijuana from outside of the minivan, nor was marijuana found within the minivan or on Carrillo-Alvardo's person, James indicated that he smelled a strong odor of marijuana and diesel fuel while searching the minivan and that he smelled the same odors on Carrillo-Alvardo. Officers also testified at the suppression hearing and trial that diesel fuel or petroleum is often used to mask the odor of marijuana. Between the

two cargo vans, the total amount of marijuana seized was approximately 2,546 kilograms and had an estimated value of $5.6 million dollars.

Following their arrests, Landeros-Sandoval and Carrillo-Alvardo were indicted on January 19, 2011, along with several others, and charged in Count 1 with knowingly and intentionally conspiring to possess with the intent to distribute 1,000 kilograms of marijuana in violation of 21 U.S.C. § 841 (b)(1)(A)(vii) and 21 U.S.C. § 846, and in Count 3 with aiding and abetting by knowingly and intentionally possessing with the intent to distribute 1,000 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vii), and 18 U.S.C. § 2. They both pled not guilty and filed motions to suppress the evidence acquired at the stops. After an evidentiary hearing and briefing, the magistrate issued a report recommending the motion be denied. The district court, adopting the magistrate's report, denied the motion. Following a three-day trial, a jury found Landeros-Sandoval and Carrillo-Alvardo guilty on both Counts 1 and 3. The defendants brought motions for acquittal at the close of the United States' and the defendants' arguments. The district court denied the motions and sentenced Carrillo-Alvardo to a concurrent term of 121 months as to Counts 1 and 3 and Landeros-Sandoval to a concurrent term of 240 months as to Counts 1 and 3. Landeros-Sandoval and Carrillo-Alvardo appeal their convictions.

## II. Denial of Motion to Suppress

*1. Legal Standard*

When reviewing a ruling on motion to suppress, we review factual determinations for clear error and legal determinations *de novo*. *United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003). If the district court has denied the motion to suppress, as is the case here, we "must consider the evidence in the light most favorable to the government." *United States v. Garza*, 10

F.3d 1241, 1245 (6th Cir. 1993). The ultimate determination regarding the legality of the stop is treated as a conclusion of law and reviewed *de novo*. *Galloway*, 316 F.3d at 628.

The Fourth Amendment requires probable cause for a search or seizure to be lawful. One narrow exception to this requirement is for investigatory detentions, otherwise termed *Terry* stops. To assess the legality of an investigatory stop, we apply a two-pronged test. We first assess "whether there was a proper basis for the stop, which is determined by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion" that the person is committing or has committed an offense. *Garza*, 10 F.3d at 1245 (internal citation omitted). Second, we review "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.*

Reasonable suspicion determinations are reviewed using a totality of the circumstances analysis. *United States v. Galaviz*, 645 F.3d 347, 352 (6th Cir. 2011). Under this process, "individual factors, taken as a whole, [may] give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). Police officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citation and quotation omitted). An officer's reasonable suspicion can arise from a myriad of direct and indirect sources, including personal observations, informant tips, dispatch information, information from other officers, and more generalized factors, such as the nature of the area, the weather conditions, and the time of day.

*See Illinois v. Wardlow*, 528 U.S. 119, 129–30 (2000); *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008); *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008). Additionally, under the "collective knowledge rule," "an officer may conduct a stop based on information obtained by fellow officers . . . even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop." *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012). While reliance on a mere "'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (internal citation omitted).

### 2. Application

Landeros-Sandoval and Carrillo-Alvardo both contend that the police lacked a particularized basis to believe that they had committed or were going to commit a criminal offense, and, therefore, that their stops violated the Fourth Amendment. We disagree. The information available to the police, when viewed under the totality of the circumstances, satisfied the reasonable suspicion requirement.

We begin with the tip. The defendants assert that the tip should be analyzed as an "anonymous" tip because no information was provided at the suppression hearing regarding whether the tip came from a reliable confidential informant or an unknown individual. *See Florida v. J.L.*, 529 U.S. 266, 270 (2000). To the contrary, the record indicates that the informant was known and had assisted prior investigations. *See id.* (indicating that a known informant is one whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated). As the district court indicated, "[t]he informant in this case had proven reliable" and "had provided information to Detective Culver in the past which

resulted in the identification of a number of individuals in another investigation." R. 246, Mem. Op. and Order at 6–7, Page ID # 1116–17.[1] Thus, when the informant indicated that a certain color tractor-trailer with specific markings would drop off a large shipment of marijuana at the auto shop in the evening of December 15, 2010, the police rightfully believed they had received "credible information that a large quantity of narcotics was going to be delivered at that location that evening." R. 154, Supp. Hrg. Tr., Keller, Page ID # 434. Although the police had not observed marijuana prior to the stops, the other information provided by the informant was fully corroborated. The police observed a tractor-trailer of the correct color and with the correct markings at the anticipated destination at the correct time.[2]

It should also be recalled that the officers did not rely solely on the tip, anonymous or otherwise. They had their investigative history and their observations from the evening of December 15, 2010. Over the course of two years, the police had developed information that the auto shop was being used as a "chop shop" and drug distribution point. This information was known by the arresting officers. The police had also witnessed the unloading of the tractor-trailer at night after business hours during winter weather. An officer further testified that in his

---

[1] Sergeant Thomas Schardein testified as to why he considered Culver's informant reliable in the suppression motion for the related prosecution of Luis Salcido-Guzman. R. 197, Supp. Hrg. Tr., Guzman, Page ID # 745. The district court denied Salcido-Guzman's motion to suppress in the same order denying Landeros-Sandoval and Carrillo-Alvardo's motion to suppress. While Schardein was not one of the officers who pulled over either Landeros-Sandoval or Carrillo-Alvardo, he was part of the group of officers involved in stopping the first group of vehicles and also familiar with the informant's prior reliability. Additionally, O'Toole, who stopped Landeros-Sandoval, received weekly briefs on the investigation as Culver's supervisor and was presumably familiar with the informant's reliability. R. 154, Supp. Hrg. Tr., O'Toole, Page ID # 446. Thus, the police officers, through the collective knowledge rule, knew that the informant was not in fact anonymous and had previously provided information that had been corroborated.

[2] Regarding precisely when the tractor-trailer arrived, there is some ambiguity, but at the suppression hearing, Keller testified that "I'm fairly confident that that tractor-trailer arrived that evening just shortly *after* [Detective Culver] got the information that that tractor-trailer was coming." *Id.* at Page ID # 414 (emphasis added).

experience, it is common for large loads of narcotics to be divided into smaller loads at distribution points.

The manner in which the vehicles traveled together further supported reasonable suspicion. Shortly after the tractor-trailer was unloaded, the police witnessed a convoy of vehicles depart from the auto shop. This convoy divided into two groups of vans which headed in different directions. The officers never observed any traffic violations; however, they expressed their belief, after observing the vans change lanes in unison, drive at the same speed, and make multiple turns together over the course of a few miles, that the vehicles were driving in tandem, and indicated that in their experience this was a common practice among drug traffickers. *See United States v. French*, 974 F.2d 687, 692 (6th Cir. 1992) (holding that police had reasonable suspicion to stop a car that was acting as a chase car and slightly speeding); *United States v. Allen*, 705 F.3d 367, 368 (8th Cir. 2013) (similar); *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1228 (10th Cir. 2008) (similar); *United States v. Soto*, 591 F.2d 1091, 1098–99 (5th Cir. 1979) (similar). Unlike other cases, in which tandem driving was found to be an insufficient basis for asserting reasonable suspicion, tandem driving was not the primary or only basis for the stops in this case. *See United States v. Espino-Urvan*, No. 12 Cr. 337 (LTS), 2013 WL 2255953, *7 (S.D.N.Y. May 21, 2013). Finally, the officers were aware from the radio transmissions that the first group of cars had failed to stop immediately, which raised concerns that the suspects might attempt to flee or be a danger to the officers.

Taken altogether, especially in light of the collective knowledge rule, the combination of (1) the informant's tip, which was corroborated by the presence and description of the tractor-trailer; (2) the prior two-year investigative history, which was briefed to the officers; (3) the activity witnessed by Lee, specifically the unloading of the tractor-trailer at night during

inclement weather at a suspected drug distribution location after business hours; (4) the officers' observations that, shortly after unloading vehicles, two sets of vehicles left the location and drove in tandem on a wintry night when few cars were on the road; and (5) the officers' training and experience investigating drug trafficking, more than fulfill the reasonable suspicion requirement.

As to the argument that the police had predetermined that all vehicles leaving the auto shop would be stopped, we evaluate "whether reasonable suspicion existed at the point of seizure, not at the point of attempted seizure." *United States v. Jones*, 562 F.3d 768, 773 (6th Cir. 2009). During the suppression hearing, the officers described the information discussed above, which arose before *and* after the initial briefings and prior to the actual seizure of the vehicles. Thus, at the moment when the officers made the traffic stops, the officers had sufficient evidence to find reasonable suspicion. This determination that the police had reasonable suspicion is consistent with other similar cases. *See, e.g.*, *United States v. Flores*, 571 F.3d 541, 544–45 (6th Cir. 2009) (finding reasonable suspicion based on intercepted conversations indicating that a drug delivery was about to take place at a suspected stash house and the presence of an unfamiliar vehicle at the location at the time of delivery); *United States v. Davis*, 514 F.3d 596, 600–01 (6th Cir. 2008) (finding reasonable suspicion on the basis of an informant's indication that the defendant would be "posted-up" at a specific location in a high crime area, the presence of the defendant at the location, and the fact that the defendant did not appear to have a license on file though he was driving); *Garza*, 10 F.3d at 1246 (finding reasonable suspicion to stop a truck where the defendant made phone calls with a suspected drug distributor, where the defendant paid "close attention" to a truck that a police drug dog had alerted was carrying marijuana, and where two trucks traveled in tandem). The officers therefore

satisfied the "minimal level of objective justification for making the stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

Having assessed the validity of the initial stop, we now review the officers' subsequent conduct. Once the police initiated the stops, it was only a matter of minutes before they discovered the bales of marijuana and arrested Landeros-Sandoval and Carrillo-Alvardo. The defendants were not arrested, nor were their vehicles searched, until the police had smelled and viewed the marijuana in the cargo area. Under these circumstances, the degree of intrusion into the suspect's personal security was reasonably related in scope and that the police had probable cause to arrest the suspects. *See Davis*, 514 F.3d at 610 (finding probable cause to arrest where marijuana was in plain view in a vehicle); *Garza*, 10 F.3d at 1246 (finding probable cause to search a vehicle where an officer smelled marijuana). Accordingly, we **AFFIRM** the denial of the motion to suppress for both Landeros-Sandoval and Carrillo-Alvardo.

### III.    Sufficiency of the Evidence

*1. Legal Standard*

Landeros-Sandoval and Carrillo-Alvardo next argue that the evidence to support their convictions is insufficient. We review such claims *de novo*. *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009). To sustain a conviction, we must assess "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wallace*, 597 F.3d 794, 800 (6th Cir. 2010) (quotation marks and internal citations omitted). Direct and circumstantial evidence can be used to satisfy the government's burden. *Gunter*, 551 F.3d at 482. Further, "[t]he government may meet its burden through circumstantial evidence alone, and

such evidence need not exclude every possible hypothesis except that of guilt." *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir. 1995).

    *2. Sufficiency of the Evidence to Support the Conspiracy Convictions*

"To sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must have proved: (1) an agreement to violate drug laws, in this case 21 U.S.C. § 841; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Sliwo*, 620 F.3d 630, 633 (6th Cir. 2010) (internal quotation marks and citation omitted). The defendants argue that the government has failed to satisfy the first and second prongs—that they entered in an agreement with their co-conspirators or that they knew the object of the conspiracy.

In *United States v. Sliwo*, this court overturned a conviction for conspiracy to distribute marijuana where the defendant transported an empty van and served as a lookout when the drugs were loaded, but failed to actually see the drugs being loaded. *Id.* As this court concluded, "[n]o evidence was presented that demonstrated Defendant's knowledge that the purpose of the scheme was the acquisition of marijuana." *Id.* at 638. The court caveated its determination that there was insufficient evidence by acknowledging, "[i]f Defendant had entered the truck yard, his conviction may have been affirmed even though nobody directly saw him loading marijuana into the van. In addition, if Defendant had entered the van after the marijuana was loaded, even though the boxes were all closed, the conviction may have been affirmed." *Id.* at 637 n.5.

While "participation in a scheme whose ultimate purpose a defendant does not know is insufficient to sustain a conspiracy," *id.* at 633, this is clearly not such a circumstance. Unlike *Sliwo*, direct and circumstantial evidence presented to the jury linked Landeros-Sandoval and Carrillo-Alvardo to the essential object of the conspiracy: the possession with the intent to distribute marijuana. *Id.* The following evidence was presented at trial. An informant had told

the police that a large shipment of marijuana was going to be delivered by a tractor-trailer at the auto shop. The auto shop had been under investigation for two years for involvement in stolen auto parts and narcotics. The police observed a tractor-trailer, which matched the informant's description, being unloaded with a fork lift during inclement weather and after business hours, making it less likely that the defendants were unlucky bystanders or customers. Moreover, given the size of the shipment, the jury could reasonably have inferred that several individuals were involved in the unloading of the trailer and the reloading of the drugs into the vans.[3] After the trailer was unloaded, a caravan of vehicles, including two white cargo vans completely loaded with marijuana, left the auto shop. Each cargo van was followed by a minivan, and the vans proceeded to drive in tandem.

Focusing for a moment on Landeros-Sandoval, he was discovered by police transporting a cargo van carrying over a ton of marijuana. This was not a case where he was merely present at the scene of the crime or driving a vehicle where the drugs were hidden in the gas tank or transporting a closed box filled with odorless drugs. *See United States v. Craig*, 522 F.2d 29, 31 (6th Cir. 1975); *United States v. Coppin*, 1 F. App'x 283 (6th Cir. 2009); *United States v. Morrison*, 220 F. App'x 389 (6th Cir. 2007). The marijuana, which was located in the rear of the cargo van, could easily be seen from where Landeros-Sandoval was driving, and the marijuana was packaged into bundles commonly used to transport the drug. Finally, the officers testified that the smell of marijuana and diesel was so strong that they could smell it from outside of the vehicle. "The smell of marijuana is certainly relevant evidence, and courts have pointed to the smell as evidence that the presence of marijuana was obvious." *United States v. Wright*, 12 F.3d

_____

[3] O'Toole testified that it took seven to ten officers a couple hours to unload the marijuana from the cargo vans, and that the marijuana bales smelled of diesel fuel. He also indicated that after going home his clothing smelled strongly of marijuana. R. 397, Tr. Tran., O'Toole Testimony, Page ID # 2050–51.

215, 1993 WL 465164, *4 (6th Cir. 1993) (unpub.) (citing multiple cases in which the smell of marijuana was used as evidence). Under these circumstances, it belies belief that Landeros-Sandoval did not know that he was transporting marijuana or engaging in a conspiracy to distribute marijuana.

While the sufficiency of the evidence with relation to Carrillo-Alvardo is a closer call, enough evidence has been presented to support his conviction for conspiracy. We will not repeat the evidence discussed above. Suffice to say, Carrillo-Alvardo was also present at the auto shop, which was suspected to be a "big distribution point for marijuana," R. 397, Tr. Tran., James Testimony, Page ID # 2093, on the evening that a large shipment of drugs was allegedly unloaded. He drove a chase car mimicking the movement of Landeros-Sandoval's drug-laden cargo van. Police discovered a pen used to detect counterfeit bills and a handwritten note in Carrillo-Alvardo's minivan with the name "Landeros-Sandoval" written on it, further tying him to the drug van. Also, critically, the jury heard testimony that Carrillo-Alvardo reeked of a combination of marijuana and diesel, and his car smelled strongly of the same odor.[4] This smell suggests that Carrillo-Alvardo assisted with the loading or was present at the loading or at a minimum knew about the marijuana, which was the essential object of the conspiracy. *See Sliwo*, 620 F.3d at 638.

Finally, the jury heard testimony that approximately 2,546 kilograms of marijuana with an estimated street value of $5.6 million dollars was confiscated. A reasonable jury could infer that "it would be highly unlikely for drug dealers to hire [an innocent third party] to move

---

[4] As James described the smell, "[f]rom outside [Carrillo-Alvardo's] vehicle once the window was down, the odor was overwhelming from that vehicle to a point that I actually thought, with my training and experience, that there would be several bales of marijuana in this vehicle. It was a marijuana odor with a masking odor of diesel or kerosene fuel. *And it was overwhelming and it was also on his person . . . .*" R. 397, Tr. Tran., James Testimony, Page ID # 2091 (emphasis added).

millions of dollars of marijuana that had a pungent odor and was wrapped in clear plastic." *United States v. Bonas*, 434 F. App'x 422, 431 (6th Cir. 2011); *see also United States v. Gbemisola*, 225 F.3d 753, 760 (D.C. Cir. 2000) (similar); *United States v. Quilca-Carpio*, 118 F.3d 719, 722 (11th Cir. 1997) (similar). While this evidence is not of the smoking-gun variety, "[i]nferential proof may be controlling where the offense charged is so inherently secretive in nature as to permit the marshalling of only circumstantial evidence. This is the norm in drug conspiracy prosecutions . . . ." *United States v. Pelfrey*, 822 F.2d 628, 632 (6th Cir. 1987).

Accordingly, a reasonable jury could have determined that the defendants knew of the conspiracy and agreed to join it. As the defendants have not satisfied the "very heavy burden" necessary to overturn their convictions, *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007), we **AFFIRM** their convictions on the conspiracy charge.

*3. Sufficiency of the Evidence to Support the Aiding and Abetting Convictions*

Landeros-Sandoval and Carrillo-Alvardo next argue that the government has presented insufficient evidence to satisfy the charge for aiding and abetting. Just as a reasonable jury could have determined that the defendants knew about and participated in a conspiracy to distribute the marijuana, for the same reasons there is sufficient evidence for a jury to have convicted them of aiding and abetting. The defendants were participants who assisted in the transportation of the drugs and the commission of a crime, not merely hapless and unwitting spectators. *See United States v. Pena*, 983 F.3d 71, 73 (6th Cir. 1993) (finding insufficient evidence for aiding and abetting where the government only showed the defendant's presence as a passenger in a car carrying cocaine). A reasonable jury could conclude based upon the presence of the defendants at the location where the drugs were unloaded, their coordinated activities to transport a large

quantity of drugs, the smell of marijuana and diesel fuel in their vehicles and on Carrillo-Alvardo's person, and in the instance of Landeros-Sandoval, the presence of marijuana in his vehicle, that they had knowledge of the "general scope and nature of the illegal [activity] and awareness of the general facts concerning the venture." *Sliwo*, 620 F.3d at 638 (internal citation omitted). We, therefore, **AFFIRM** the defendants' convictions for aiding and abetting.

**IV.     Sufficiency of the Indictment and the *Alleyne* Challenge**

Landeros-Sandoval argues that his conviction should be reversed because his prior drug conviction, which increased the mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A), was not submitted to the jury and because the indictment failed to list the prior felony drug conviction as an element of the offense. This argument is predicated on the recent Supreme Court case in *Alleyne v. United States*, 133 S. Ct. 2151 (2013). There, the Court held any fact that "increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt . . . [and therefore, the] mandatory minimum is an 'element' that must be submitted to the jury." *Id.* (internal citation omitted). The *Alleyne* Court, however, expressly refused to address whether the traditional exception under *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), which establishes that prior convictions need not be presented to a jury or included in an indictment, still applied. *Alleyne*, 133 S. Ct. at 2160 n.1.

Landeros-Sandoval claims that *Alleyne*'s holding that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury" indicates that the *Almendarez-Torres* exception no longer has continued viability. This court has already addressed this question and determined that the Supreme Court's decision in *Almendarez-Torre* is still good law, even post-*Alleyne*. *United States v. Mack*, 729 F.3d 594, 609 (6th Cir. 2013); *United States v. Wynn*, 531 F. App'x 596 (6th Cir. 2013) (per curiam). Consistent with this

precedent, we reject Landeros-Sandoval's argument that his prior conviction should have been submitted to the jury or included in the indictment and **AFFIRM** his sentence.

### V. Minor Role Reduction

Finally, Carrillo-Alvardo contends that his sentence was procedurally and substantively unreasonable because the district court failed to consider his minor role when calculating the advisory guidelines range and when determining his actual sentence. Under U.S.S.G. § 3B1.2, a defendant who is "substantially less culpable than the average participant" can receive a sentence reduction. U.S.S.G. § 3B1.2, cmt. 3(A). Carrillo-Alvardo concedes that he did not raise an objection before the district court regarding its failure to apply this minor role reduction. Accordingly, we review the claim of procedural adequacy for plain error, which requires Carrillo-Alvardo to show "(1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (internal quotation marks and citation omitted).

Carrillo-Alvardo has not satisfied this burden. The only evidence presented at sentencing of Carrillo-Alvardo's minor role was the claim made by his attorney that Carrillo-Alvardo was a "tag-along behind a mule driving a vehicle." R. 396, Sent. Tr., Page ID # 1777. In his brief to this court, Carrillo-Alvardo again makes a bare-bones assertion that his involvement with the marijuana was limited and that he was not even a courier. He does not cite, however, the sentencing transcript, nor does he indicate any additional mitigating evidence presented to the district court to substantiate his claim of having a minor role or being substantially less culpable. In explaining its sentence, the district court referred to the 18 U.S.C. § 3553 factors and indicated, "I think that all things taken, including the seriousness of the offense and the

characteristics of the offense, as well as [Carrillo-Alvardo's] personal characteristics, and the need to reflect and respect—to encourage respect for the law, militates in favor of the sentence that I have imposed here . . . ." R. 395, Sentencing Tr., Page ID # 1780. As Carrillo-Alvardo has not demonstrated that the trial court plainly failed to "analyze the relevant sentencing factors" *Vonner*, 516 F.3d at 388 or was obviously in error, the district court's sentence was procedurally reasonable.

Turning to the question of substantive reasonableness, "[a] sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conaster*, 514 F.3d 508, 520 (6th Cir. 2008). Carrillo-Alvardo argues that the district court failed to consider a relevant sentencing factor, namely his minor role in the offense. The evidence indicates that the court was not only familiar with Carrillo-Alvardo's role in the offense, but also that it considered this precise point in selecting his sentence. While the government requested a mid-to-high sentence within the guidelines range because of the quantity of marijuana involved, Carrillo-Alvardo's actual sentence of 121 months is at the very bottom of the guidelines range of 121 to 151 months, and only one month over the 120 mandatory minimum term of imprisonment. *See* 21 U.S.C. § 841(b)(1)(A)(vii). The court clearly attempted to balance what it viewed as a "very bold crime involving quite a large amount of marijuana," R. 395, Sentencing Tr., Page ID # 1780, with Carrillo-Alvardo's modest criminal history and role. As there is a "presumption of reasonableness for within-guidelines sentences," *Vonner*, 516 F.3d at 389, Carrillo-Alvardo's sentence was also substantively reasonable, and, we therefore **AFFIRM** his sentence.

## VI. Conclusion

For all of these reasons, we **AFFIRM** the judgment of the district court.