RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0103p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

No. 18-1884

MOHAMED BELAKHDHAR,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:18-cr-20072-2—Arthur J. Tarnow, District Judge.

Decided and Filed: May 28, 2019

Before: COOK, McKEAGUE, and WHITE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellant. Joseph A. Niskar, Pontiac, Michigan, for Appellee.

_____

## OPINION

_____

COOK, Circuit Judge. After observing Mohamed Belakhdhar driving in tandem with a car suspected of transporting heroin from Chicago to Detroit, Drug Enforcement Administration agents directed local police to stop his car. That stop ultimately led investigators to discover two kilograms of heroin hidden in Belakhdhar's trunk. Before trial, Belakhdhar asked the district court to suppress the drug evidence, asserting that the police violated his Fourth Amendment rights in stopping his vehicle. Although the district court agreed, we see things differently.

**I.**

On a cold, windy, and drizzly morning in January 2018, Drug Enforcement Administration (DEA) agents laid in wait along a stretch of Interstate 94, looking for a black Toyota Camry. The previous evening, agents had arranged for a known confidential informant to purchase heroin from a supplier named Henry Soto. Soto agreed to drive the shipment from Chicago to Detroit the following day and meet the informant at a casino downtown. The informant alerted DEA agents that Soto would probably drive his Camry, stashing the drugs in a large bucket in his car. That same evening, federal agents obtained a "ping" warrant permitting them to track the location of Soto's cell phone.

Morning arrived. Agents spotted Soto's Camry on the busy highway, matching it to the location of Soto's cell phone. Their confidential informant called Soto, confirming that Soto had already hit the road. As agents watched Soto's vehicle, they also noticed a grey Toyota RAV4 behind it, driving at approximately the same speed as the Camry and changing lanes at the same time. Like the Camry, the RAV4 bore Illinois plates, though the RAV4's were temporary. After observing all this, the agents concluded that the cars were traveling "in tandem"—a common practice of large-scale drug traffickers gathering counter-surveillance or looking to thwart law enforcement during the trip—and asked Michigan State Police to pull over both cars.

While one Michigan trooper stopped the Camry, another identified the RAV4, driving up alongside it for a few minutes to "make sure it was the correct vehicle." R. 29, PageID 123. As the second trooper pulled up next to the RAV4, the car slowed to fifty-three miles per hour, two miles under the freeway's minimum speed limit. Satisfied that he had the right car, the trooper positioned himself behind the RAV4, turned on his lights, and effectuated a stop.

The RAV4's driver, Mohamed Belakhdhar, and his passenger provided the police with their identification, explaining that they were driving to visit someone in the hospital. Belakhdhar consented to a search of the car, and, after failing to find any contraband, the trooper let them go.

But the DEA agents didn't stop surveilling the vehicle. They investigated Belakhdhar's identification information, determined that Belakhdhar lacked legal immigration status, and

requested that a Border Patrol agent stop the car again. During that second stop, another agent walked a drug dog around the vehicle. The dog alerted to the back bumper. Opening the trunk, the agents discovered two kilograms of heroin hidden inside of a microwave, and arrested Belakhdhar.

Charged with conspiracy for possession and intent to distribute heroin under 28 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), Belakhdhar contended that the district court should suppress the drug evidence as fruit of a poisoned investigation. *See Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). The state troopers lacked reasonable suspicion of criminal activity and probable cause that he violated a state traffic law, he argued, and therefore violated the Fourth Amendment by stopping his vehicle the first time. Agreeing with both points, the district court suppressed the evidence. The government appealed, arguing that both stops were legal. Belakhdhar focuses only on the legality of the first stop, seemingly agreeing that the second stop passed muster as long as the first one did. We therefore limit our analysis accordingly.

## II.

When a district court grants a motion to suppress, we review its legal conclusions de novo and its factual findings for clear error, viewing the evidence in the light most likely to support the district court's decision—that is, in the defendant's favor. *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002).

Establishing reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968), involves two steps, the first of which requires the government to articulate specific facts justifying the initial detention. *United States v. Torres-Ramos*, 536 F.3d 542, 551 (6th Cir. 2008). The government here premises its stop on three facts: first, a known confidential informant's tip that a black Camry would be carrying heroin from Chicago to Detroit that morning; second, DEA agents' identification of that car on the highway connecting the two cities; and third, DEA agents noticing a grey RAV4 with temporary tags driving a few car lengths behind the Camry for an unspecified amount of time, changing lanes when the Camry changed lanes.

As an initial matter, this court must determine whether it is reviewing a factual or legal conclusion. What ground did the district court's opinion cover? Did it determine that the

government's testimony did not establish that the Camry and RAV4 were driving in tandem, or did it conclude that even if the two cars were driving in tandem, that alone could not establish reasonable suspicion of drug activity?

The answer is not clear. In support of the first interpretation, the district court specifically noted that DEA agents observed Belakhdhar's vehicle changing lanes with the Camry "for an unspecified period of time," and that the government's assertion that the vehicles were traveling in tandem for twenty minutes had no support in the record. R. 28, PageID 87. It also stated that "Belakhdhar's 'mere propinquity' to Henry Soto on I-94 'does not, without more, give rise to probable cause' or reasonable suspicion." *Id.* (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). On the other hand, the district court's clear conclusion that "tandem driving with a vehicle suspected of drug activity, alone, is an insufficient basis for reasonable suspicion," R. 28, PageID 88, suggests a legal determination.

The parties have presented the issue purely as a legal one. We therefore confine our opinion to addressing only whether driving in tandem with a vehicle suspected of drug trafficking satisfies reasonable suspicion. We leave for another day the question of what quantum of evidence supports finding that two cars are driving in tandem.

Reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). Here, the government possessed strong evidence that a drug dealer operated one car and knew that large-scale traffickers routinely use multiple cars to transport drugs. With sufficient evidence of tandem driving, connecting the dots would lead DEA agents to reasonably conclude that Belakhdhar's conduct betrayed criminal activity. *See Terry*, 392 U.S. at 30. Though individual datapoints may portray entirely innocent conduct—such as tandem driving to save on gas, as the district court suggested at the suppression hearing, *see* R. 29, PageID 134–35, or following a friend through a strange neighborhood—our cases teach that the overall scatterplot may give rise to reasonable suspicion. *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). Reasonable suspicion, after all, does not present a particularly high bar. *Navarette v. California*, 572 U.S. 393, 397 (2014).

Belakhdhar and the district court rely on one of our unpublished cases, *United States v. Carrillo–Alvardo*, 558 F. App'x 536 (6th Cir. 2014), as establishing that driving in tandem with a car suspected of criminal activity cannot alone satisfy the reasonable suspicion requirement. But that case reinforces the exact opposite proposition. *Id.* at 539–44. There, a known informant tipped police to a tractor-trailer's imminent delivery of a large marijuana shipment to an auto shop. *Id.* at 539–40, 543. The officers already knew that the auto shop functioned as a drug distribution hub. *Id.* Sure enough, the specified trailer arrived—late in the day, weather wintry. *Id.* Workers unloaded the cargo, and a convoy of vans soon left the shop, dividing into two groups, each set driving in tandem. *Id.* Knowing that drug dealers often divvy up large loads into smaller ones at distribution hubs, and putting two (the presence of a truck carrying drugs) and two (the cohort of vans working in concert) together, the officers acted—stopping both convoys and ultimately seizing over two thousand kilograms of marijuana. *Id.* Those facts, we decided, "more than fulfill[ed] the reasonable suspicion requirement." *Id.* at 543; *see also United States v. Rodriguez–Rodriguez*, 550 F.3d 1223, 1228 (10th Cir. 2008) ("Sufficient evidence that two vehicles are driving in tandem plus evidence that one vehicle contains contraband can provide probable cause sufficient to support arresting the driver of the other vehicle.").

Assuming sufficient evidence of tandem driving, this case would fundamentally present the same narrative: DEA agents identify one vehicle likely carrying drugs and suspect that a second vehicle is working in concert with the first. *See also United States v. Zamudio-Carrillo*, 499 F.3d 1206, 1208–10 (10th Cir. 2007) (finding probable cause to pull over a second car where an officer observed two vehicles with consecutively numbered specialty license plates driving a quarter mile apart along a Kansas interstate highway, the first of which contained a false floor compartment). *But see United States v. Robert L.*, 874 F.2d 701, 704 (9th Cir. 1989) (stop premised on tandem driving was improper where officers observed the cars driving for only approximately 1 kilometer, or 0.67 miles). Thus, as a matter of law, to the extent the district court meant to convey that tandem driving with a vehicle suspected of drug activity cannot, alone, support reasonable suspicion, it erred.

## III.

We VACATE the district court's decision and REMAND for proceedings consistent with this opinion.