NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0399n.06

No. 19-2143

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jul 13, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| NABOR ACOSTA-BARRERA, and ALBERTO FLORES-HERNANDEZ, | ) | |
| Defendants-Appellees. | ) | |

_____ /

Before: MERRITT, GUY, and STRANCH, Circuit Judges.

**RALPH B. GUY, JR., Circuit Judge.** The government appeals the district court's order granting the defendants' motion to suppress evidence seized during the execution of a search warrant at a residence located on Shirley Lane in Dearborn Heights, Michigan. The district court found the affidavit not only lacked the necessary nexus to support probable cause to search the residence, but also was so deficient that that the *Leon* good faith exception to the exclusionary rule did not apply. Concluding that the affidavit was not "so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable" under the *Leon* good faith exception, we reverse and remand for further proceedings consistent with this opinion. *United States v. Leon*, 468 U.S. 897, 923 (1984).

**I.**

Defendants Nabor Acosta-Barrera and Alberto Flores-Hernandez were charged in a two-count Superseding Indictment with conspiracy to possess with intent to distribute and with possession with intent to distribute drugs that were seized from the Shirley Lane residence. Acosta-Barrera moved to suppress the fruits of the search—including two kilograms of heroin, two kilograms of fentanyl, three bundles of cash totaling $57,980, a heat sealer, money counters, and drug packaging materials—on the grounds that the search warrant was issued without sufficient probable cause to believe that evidence of a crime would be found there. Flores-Hernandez joined that motion, arguing that he could challenge the evidence because he had been living there with his son-in-law Acosta-Barrera. After briefing and oral argument, the district court granted the defendants' motion to suppress in an order entered September 3, 2019.

The government appealed, certifying that "the appeal is not taken for purposes of delay and that the evidence is a substantial proof of fact material in this proceeding." 18 U.S.C. § 3731. The district court granted the defendants release pending appeal, and they were promptly deported to Mexico pursuant to final orders of removal. Defendants suggest that this may have rendered the appeal moot. The government represents that the charges remain pending so that—if this appeal is successful—the prosecution could proceed in the event that the defendants were extradited or otherwise returned to the United States.

**II.**

Although the defendants have not moved to dismiss the appeal as moot, "Article III of the Constitution restricts the power of federal courts to 'Cases' and 'Controversies.'" *Chafin v. Chafin*, 568 U.S. 165, 171-72 (2013). This requirement continues "through all stages of federal judicial proceedings, trial and appellate." *Id*. (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472,

477 (1990)).  "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  *Id.* at 172 (quoting *Knox v. Serv. Emp. Int'l Union*, 567 U.S. 298, 307-08 (2012)).  In fact, the Court in *Chafin* pointed to a situation much like this one as an example of an appeal that did not become moot.  *Id.* at 176 ("And we have heard the Government's appeal from the reversal of a conviction, even though the defendants had been deported, reducing the practical impact of any decision; we concluded that the case was not moot because the defendants might 'reenter this country on their own' and encounter the consequences of our ruling." (citation omitted)); *see also United States v. Barajas-Nunez*, 91 F.3d 826, 829 (6th Cir. 1996).  The government's interest in its appeal from the suppression order is not rendered moot by the defendants' deportation on final orders of removal.

### III.

"When a district court grants a motion to suppress, we review its legal conclusions de novo and its factual findings for clear error, viewing the evidence in the light most likely to support the district court's decision—that is, in the defendant's favor."  *United States v. Belakhdhar*, 924 F.3d 925, 927 (6th Cir. 2019) (citing *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002)); *see also United States v. Guimond*, 116 F.3d 166, 169 (6th Cir. 1997).  A district court's legal conclusions with respect to the existence of probable cause and application of the good-faith exception are reviewed de novo.  *See United States v. Gilbert*, 952 F.3d 759, 762 (6th Cir. 2020); *United States v. White*, 874 F.3d 490, 495 (6th Cir. 2017).

### A.

An ongoing investigation of a large drug trafficking operation snagged Acosta-Barrera and Flores-Hernandez when the target of the investigation—Victaliano Torres Alvarez (Torres)—got into a vehicle with them carrying a large amount of cash on May 3, 2018.  Acosta-Barrera was

driving the vehicle in question, which was registered to him at the Shirley Lane address. The search warrant for that address was issued on May 4, 2018, based on the affidavit of the same date sworn to by Detroit Police Officer Nicholas Bukowski.

The first several pages of the affidavit described Officer Bukowski's training and experience as an eight-year veteran of the Detroit Police Department, including his training in criminal drug investigations and participation in "numerous investigations involving narcotics trafficking, manufacturing, and possession." Based on that training and experience, Bukowski stated that he was "familiar with narcotics traffickers' methods of operation, including distribution, storage and transportation of narcotics, the collection of proceeds of narcotics trafficking, and the methods of money laundering used to conceal the nature of the proceeds." Bukowski therefore knew, among other things described in the affidavit, that "[i]t is common for drug traffickers to conceal drug records, drug proceeds and other items [associated with drug trafficking] within their residences, garages, safety deposit box(es), businesses and automobiles"; that "[d]rug traffickers must maintain on hand amounts of United States currency in order to maintain and finance their on-going (sic) drug business"; and that "possession of large sums of questionable currency in small and medium denominations, along with the manner in which the currency is handled, carried and concealed, may establish probable cause to believe that there is a substantial connection between the questionable currency and illegal drug transactions."

Officer Bukowski stated that the investigation of Acosta-Barrera and the Shirley Lane residence stemmed from a DEA investigation of Torres that began in November 2017. Namely, court-ordered location information for a phone number that was used to contact "a suspected source of heroin supply in Mexico" led DEA Agent Stachecki to a red Chevy Tahoe with a Michigan license plate. The Tahoe was registered to a deported criminal alien at an address in

Hanover, Michigan, but the phone number was registered to Torres at an address in Coldwater, Michigan. On November 10, 2017, a warrant authorized placement of a GPS tracking device on the Tahoe, which allowed agents to confirm that the person using the phone also used the Tahoe as a common mode of transportation.

The Tahoe was tracked over the next several days traveling to Chicago, Illinois, Fort Wayne, Indiana, and Battle Creek, Michigan, with short stops in different areas of each location consistent with "the distribution of narcotics when using Chicago[] as a main supply hub for narcotics." And, on November 13, 2017, Torres was stopped while driving the Tahoe after he was observed going into and coming out of a location in Battle Creek with a large box. A search of the box revealed a small air compressor with a hidden compartment in which a large amount of United States currency was found. The money was seized as suspected drug proceeds, but Torres was released pending further investigation. The GPS device lost power on December 3, 2017, and was retrieved outside an apartment believed to be where Torres resided in Coldwater, Michigan, on December 16, 2017.

Toll record data for Torres's phone number obtained on April 11, 2018, indicated that Torres continued to communicate with numbers from across the United States and Mexico in a pattern "that is indicative of [a] narcotics courier who makes contact with a narcotics customer in order to arrange a narcotics transaction" in which "there is no additional contact between the two parties after the transaction has taken place." On May 3, 2018, using an updated warrant to track Torres's phone, DEA agents from Chicago made a traffic stop of a vehicle that Torres was seen entering. The stop that led to the defendants' arrests was described as follows:

> Upon completion of the stop[,] DEA Agents recovered a bag which contained a large amount of US currency. At this time the DEA Agents were able to identify the driver of the vehicle Alvarez entered as Nabor Acosta-Barrera who is a Mexican national believed by the DEA to be in the country illegally. The vehicle Acosta-

> Barrera was driving was registered to him at 26069 Shirley Ln, Dearborn Heights, MI. The DEA Agents seized the US currency as suspected narcotics proceeds and searched the remainder of the vehicle recovering a MoneyGram inside of the driver's armrest along with a ledger outlining several money pickups and relating those pickups directly to Mexico and a possible recipient's phone number.

Notably, Torres told the agents "that he was meeting with the driver of the vehicle in order to drop off money." Also, "the driver, Acosta-Barrera, made an unprovoked statement concerning DEA Agents following the 'guy' who was dropping off the money."

The affiant related the investigatory steps that followed. DEA agents searched an Illinois address identified on the MoneyGram receipt found in the console of Acosta-Barrera's vehicle, and "recovered another bag containing a very large sum of US currency believed to be narcotics proceeds." A search of a residence associated with Torres in Warrenville, Illinois, "resulted in the seizure of a large sum of suspected cocaine and methamphetamine." From this, the affidavit concluded that Torres "is a narcotics trafficker who is involved in the transportation and distribution of narcotics and narcotics proceeds in the Michigan and Illinois area."

The affidavit states that an investigation of Acosta-Barrera, whose vehicle was registered to the Shirley Lane address, revealed that the utilities for the Shirley Lane address were in his name, that he was currently paying for the utilities at the Shirley Lane address, and that he used his passport to initiate the account for the utilities at the Shirley Lane address. Attempts to contact the owners of the Shirley Lane residence were answered by an attorney for the owners, who stated that "Nabor Acosta is the man who rents the location but that he pays cash and there is no rental contract available." Surveillance conducted at the Shirley Lane address on May 3, 2018—the same day that the defendants were arrested in Chicago—revealed no activity as "there were no vehicles at the location and there appeared to be several shipping notifications on the front door of the location as if it had not been visited in several days."

Based on "the recovery of US currency and ledgers in conjunction with verbal statements made by both []Torres and Acosta-Barrera." Officer Bukowski stated that he "believes that Acosta-Barrera is a Money courier for a major Drug Trafficking Organization." Knowing that it is common for such organizations to "maintain homes as stash houses for large amounts of US currency and/or narcotics and to not frequent these homes on a regular basis," Bukowski believed that the Shirley Lane address "is a stash house for U.S. Currency generated from a Major Drug Trafficking organization." The affidavit concludes with the officer's belief that there would be "records of money transactions in this location," and that items such as "narcotics, firearms, currency, and other indicia of narcotics trafficking" would be found at the Shirley Lane residence.

Based on this affidavit, a magistrate judge found probable cause to search the Shirley Lane residence for evidence of drug trafficking. The warrant issued and was executed on May 4, 2018, and resulted in the seizure of large amounts of heroin and fentanyl, nearly $60,000 in cash, money counters, and other evidence consistent with drug trafficking activities.

**B.**

The Fourth Amendment commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A magistrate reviewing a search warrant application considers whether the information in the affidavit adds up to "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). Probable cause requires a connection or nexus between the evidence sought and the place to be searched. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). That connection must not be vague or generalized, *id.* at 595, and must "present sufficient facts demonstrating why the police officer expects to find evidence in the residence," *United States*

*v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (citing *Carpenter*, 360 F.3d at 595). That determination is made from the "totality of the circumstances," *Florida v. Harris*, 568 U.S. 237, 244 (2013), keeping in mind that "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation," *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). *See, e.g.*, *United States v. Christian*, 925 F.3d 305, 309-12 (6th Cir. 2019) (en banc).

Here, the facts established more than a reasonable probability based on Torres's phone records, the GPS tracking of the Tahoe, and the seizure of a large amount of cocaine and methamphetamine from an address in Illinois associated with Torres, that this was an ongoing large-scale drug trafficking operation. There was also a reasonable probability that Torres was involved in the movement of illegal drug proceeds associated with that drug trafficking, given the large amount of cash found hidden in the air compressor following a traffic stop in Battle Creek and the large amount of cash he was bringing to Acosta-Barrera. As to Acosta-Barrera, information obtained as a result of the May 3 stop established a reasonable probability that Acosta-Barrera played a role in the movement of the illegal proceeds of the drug trafficking conspiracy. During that stop, Torres told the agents he was meeting Acosta-Barrera to "drop off the money, and Acosta-Barrera made a statement indicating that he recognized the DEA must have been following Torres. In addition to his involvement in the transfer on May 3, other evidence discovered in his car linked Acosta-Barrera to the transfer of another large amount of U.S. currency and a ledger outlining "several money pickups and relating those pickups to Mexico and a possible recipient's phone number."

Under the totality of the circumstances, the information in the affidavit established a reasonable probability that Acosta-Barrera was involved in the movement of U.S. currency for a large drug trafficking operation. There was also sufficient information to establish Acosta-

Barrera's connection to and control over the Shirley Lane address. The affiant concluded that the residence was likely a stash house for the conspiracy, but no activity was observed during the one-day surveillance conducted while Acosta-Barrera was in custody on May 3, the same day as the traffic stop. The DEA's ongoing investigation into Torres and the drug trafficking operation—the focus of much of the affidavit—centered on Torres's travels between locations far away from the Shirley Lane residence. The DEA was unaware of Acosta-Barrera or his residence until May 3. As this court recently commented, "we have struggled to identify the quantum of evidence needed to connect drug trafficking by an individual to a probability that evidence will be found at the individual's residence." *United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018) (contrasting cases); *see also Brown*, 828 F.3d at 383 & n. 2 (discussing cases). Whether the affidavit provided sufficient connection between the evidence sought and the place to be searched is debatable, but we need not resolve that question because the *Leon* good faith exception applies. *See United States v. McCoy*, 905 F.3d 409, 415 (6th Cir. 2018).

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). The Supreme Court recognized an exception to the exclusionary rule for evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Leon*, 468 U.S. 897, 905 (1984). To decide whether the *Leon* good-faith exception applies, the court must decide "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id*. at 922 n.23. Although there are four circumstances outlined by the Court in *Leon*, defendants relied only on the third scenario. *Id*. at 914-15. That is, defendants argued that the officers relied "on a warrant based on an affidavit 'so lacking in indicia

of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* at 923 (citation omitted).

"An affidavit that is so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a 'bare bones' affidavit." *United States v. Gilbert*, 952 F.3d 759, 763 (6th Cir. 2020) (citing *United States v. White*, 874 F.3d 490, 498 (6th Cir. 2017)). That label is reserved for an affidavit that "merely 'states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'" *Christian*, 925 F.3d at 312 (quoting *United States v. Washington*, 380 F.3d 236, 241 n.4 (6th Cir. 2004)). For an officer's reliance on a warrant to have been objectively reasonable, the affidavit need only "contain 'a minimally sufficient nexus between the illegal activity and the place to be searched.'" *Brown*, 828 F.3d at 385 (quoting *Carpenter*, 360 F.3d at 596). Because this a lesser standard than probable cause, the affidavit "need not establish a 'substantial basis,' only 'some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched.'" *McCoy*, 905 F.3d at 416 (quoting *White*, 874 F.3d at 497). In other words, "[a]ll that's required in the *Leon* context are facts that show a nexus and that are not 'so vague as to be conclusory or meaningless.'" *Ardd*, 911 F.3d at 351 (quoting *Carpenter*, 360 F.3d at 596).

Here, the affidavit was not "bare bones." The district court acknowledged that the affidavit contained "a lot of detail" as to the drug activities of Torres, "some detail" as to the defendants' connection to drug activities, and "a connection with defendants and Shirley Lane." But, finding the affidavit was "'bare bones' as to Shirley Lane," the district court concluded that it was "objectively unreasonable to rely on the information as to Shirley Lane to believe that probable cause existed to search the residence." On the contrary, the good faith exception applies because

the information in the affidavit provided a "minimally sufficient nexus between the illegal activity

and the place to be searched." *Carpenter*, 360 F.3d at 596; *see also Ardd*, 911 F.3d at 351 ("Case

after case finds good-faith reliance in similar settings.") (citing cases). The details in the affidavit

about the evidence discovered in Acosta-Barrera's car, the fact that he paid rent in cash with no

rental contract, and the officer's conclusion based on his training and experience that the residence

is likely a stash house provided the "minimally sufficient nexus" between the illegal activity and

the residence. The district court erred in concluding that the good faith exception did not apply.

## IV.

The district court's order suppressing evidence obtained pursuant to the warrant to search

the Shirley Lane residence is **REVERSED** and the case is **REMANDED** for further proceedings

consistent with this opinion.